GIURBINO, Exr., etc., Appellant,

v.

GIURBINO, a Minor, et al., Appellees.

[Cite as *Giurbino v. Giurbino* (1993), 89 Ohio App.3d 646.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 62996.

Decided Aug. 2, 1993.

*Ernest E. Fabian,* for appellant.

*Rosemary D. Durkin,* Guardian *ad litem.*

*William T. Monroe,* Trustee for Suit.

*George Wm. Joseph, Jr.,* for appellees Tina Giurbino et al.

*Howard A. Eisenhardt III,* for appellee First Federal Savings Bank.

---

DONALD C. NUGENT, Judge.

This is an appeal from the decision of the Cuyahoga County Court of Common Pleas, Probate Division, finding that a certain bank account in the approximate value of $43,000 was a valid payable-on-death ("P.O.D.") account for the benefit of Tina Giurbino, a minor and great grandchild of the decedent, Concettina Giurbino. The probate court further found that the proceeds of said account were not an asset of the estate of Concettina Giurbino. Decedent's son, plaintiff-appellant Sam Giurbino, individually and as executor, timely appeals the decision of the probate court.

Concettina Giurbino (hereinafter "Mrs. Giurbino" or "decedent") died testate on September 5, 1990. The decedent's last will and testament was admitted to the Probate Court of Cuyahoga County, Ohio, on September 11, 1990 and provides that plaintiff-appellant Sam Giurbino is the sole surviving son and sole beneficiary of the decedent's estate. The estate inventory reflected no assets in the decedent's name. Appellant initiated the present action individually and as executor of his mother's estate through the filing of a complaint for declaratory judgment and injunctive relief. Appellant sought a judicial determination of the validity of a P.O.D. account naming Tina Giurbino, the decedent's great-granddaughter, the sole beneficiary. Appellant alleged that the decedent did not have the requisite testamentary capacity to create a P.O.D. account, that she was unduly influenced into creating said account, and that she was incapable of consummating a valid gift. All parties duly answered, and this cause proceeded to a hearing before a referee of the probate court.

This instant dispute involves two related transactions in which Mrs. Giurbino closed two joint and survivorship accounts which were held jointly with her son Salvatore Giurbino (hereinafter "Sam" or "appellant") at Broadview Savings and Loan, totalling $43,714.36. Mrs. Giurbino took the proceeds of these accounts and deposited them in a P.O.D. savings account at First Federal Savings Bank, wherein her great-granddaughter Tina Giurbino is the named beneficiary. Sam is challenging the two transactions, arguing alternatively that his mother was incompetent at the time of the transactions or was being unduly influenced by Connie Christian, her granddaughter and appellant's niece. Mrs. Giurbino, age eighty-five at the time of the transactions, was widowed for twenty-seven years. She had two sons from her marriage to Carmelo Giurbino, being Ross Giurbino, Sr. and Sam Giurbino. Ross, Sr. died in 1987. Prior to Ross, Sr.'s death, he and

his wife, Angela, divorced. Angela later remarried, yet remained very close to Mrs. Giurbino. Ross, Sr. and Angela had five children: Ross, Jr., John, Anthony, Carmen and Connie Christian. Ross, Jr. is married to Janice Giurbino, and they have two children: Michael (age thirteen), and Tina (age nine). It is Tina Giurbino, Ross, Jr.'s daughter, who is the named beneficiary on the instant P.O.D. savings account. At the time of her death, Mrs. Giurbino had eight grandchildren and fifteen great-grandchildren. Sam is the only surviving son of the decedent. He is married to Geraldine Giurbino and has four children: Carla Zimmerer, Perry, Gary and Patty. It is undisputed that Ross, Sr. and Sam did not get along. It is further undisputed that Ross, Sr.'s side of the family and Sam's side of the family do not get along either. Throughout the course of the hearing, each side of the family maintained that it spent more time with the decedent than the other side and did more for her.

It is undisputed that in the two years which preceded her death, Mrs. Giurbino was suffering from a malignant brain tumor. The deposition testimony of Dr. Herbert J. Weiss was admitted at the hearing before the referee. Dr. Weiss is a licensed psychiatrist who concentrates in geriatric psychiatry and is the clinical director of the geropsychiatric services program at Lutheran Medical Center Hospital, as well as the chief of psychiatry at the hospital. On May 2, 1990, Mrs. Giurbino was admitted to the geropsychiatric service program at the hospital. Dr. Weiss was her treating physician. Apparently, Mrs. Giurbino was referred to the hospital by the Merrick House Senior Center due to her "out of control behavior," threats of suicide, and accusations that her son Sam was stealing money and other valuables. Dr. Weiss also stated that her capacity for self-care had been described as having seriously declined. Dr. Weiss testified that there was no evidence of gross psychotic features, but that Mrs. Giurbino was focusing totally on a paranoid accusation. Mrs. Giurbino was very vocal in her complaints about Sam's stealing money and other valuables. Mrs. Giurbino was suffering from short-term memory loss and was diagnosed with dementia with depression features. Dr. Weiss stated that dementia is a mental illness characterized by lapses in long-term and short-term memory and by confusion, disorientation, deterioration in emotional ability, and lack of exercise of good judgment. Dementia is almost always brought about by a physical disease and, in Mrs. Giurbino's case, by her brain tumor. Based on a series of psychological tests which are designed to demonstrate presence or absence of organic brain disease, Dr. Weiss concluded that Mrs. Giurbino displayed cognitive deficits.

The record further reveals that although Mrs. Giurbino had the brain tumor for two years prior to her admission to Lutheran Hospital, her family, including both Ross, Sr.'s side and Sam's side, kept it secret from her. The tumor was located in the right frontal lobe, which controls mostly mental functions that have

to do with intelligence, judgment, retention and intellectual function. Mrs. Giurbino's tumor eventually metastasized, which led to her falling into a coma on September 2, 1990 and her death on September 5, 1990.

Dr. Weiss stated that upon her discharge on May 5, 1990, Mrs. Giurbino showed evidence of dementia with depression over allegations about her son Sam. Mrs. Giurbino was also suicidal, but due to her clinical and historical records reiterating suicidal thoughts over the last twenty to twenty-five years, Dr. Weiss did not believe she was capable of suicide. It was Dr. Weiss's opinion that Mrs. Giurbino was capable of living alone and caring for herself, although he thought that the immediate nature of her tumor dictated that she should not be left alone.

On the subject of Mrs. Giurbino's competence, Dr. Weiss elaborated by stating that despite the fact that Mrs. Giurbino showed documented evidence of dementia, she was probably competent to care for herself, although she was an extremely emotional woman, given to great outbursts, and, as such, her judgment would be compromised. The fact, however, that a patient is demented does not rule out that he or she is competent. Dr. Weiss added that you can have some evidence of memory loss, some evidence of change and some dysfunction, and still be capable of exercising good judgment and competence.

As to Mrs. Giurbino's competence in financial matters and with respect to the August 16th transactions, Dr. Weiss stated that he had no opinion as to her competence and that he would only be surmising if he stated an opinion as to whether Mrs. Giurbino was confused and incompetent on August 16, 1990. Dr. Weiss did state that the dementia would be an issue in her competence. Dr. Weiss also stated that he thought Mrs. Giurbino's judgment would always be compromised due to her personality and her emotionalism, especially in regard to her son Sam.

Valerie Gore, an assistant branch manager of First Federal Savings Bank at 4300 Clark Avenue, Cleveland, testified first at the hearing before the referee. She knew the decedent for a matter of months as a bank customer and frequently took care of Mrs. Giurbino's deposits or withdrawals. On June 22, 1990, Mrs. Giurbino came into the bank by herself and opened an account at First Federal (account No. 19–1–02991–3) with $1,530.70. Mrs. Giurbino was the sole owner of the account when it was opened. On July 24, 1990, Mrs. Giurbino was issued a new passbook for the savings account to replace the initial passbook, which Mrs. Giurbino had lost. Upon Gore's suggestion, Mrs. Giurbino kept the new passbook at First Federal in the bank's vault. Gore testified that she observed Mrs. Giurbino sign the card to open the savings account. The signature appears as "Concettina Giurbino."

On July 27, 1990, Mrs. Giurbino came into the bank by herself and changed the savings account to a payable-on-death account, naming Tina Giurbino as the

P.O.D. beneficiary. Gore testified that she approved the signature card changing the account to a P.O.D. account without Mrs. Giurbino's signature. In lieu of Mrs. Giurbino's signature, Gore wrote, "Okay, too hard for customer to sign."

Later, on August 16, 1990, Mrs. Giurbino came into the bank, this time with another lady whom Gore was unable to identify. Mrs. Giurbino deposited a check in the amount of $43,714.36 into the P.O.D. savings account (numbered 19–1–29913).[1] Mrs. Giurbino's endorsement appears on the back of the official bank check as "Concettina Giurbino."

On cross-examination, Gore stated that when she opened the instant savings account, Mrs. Giurbino appeared to know what she was doing. Gore discussed the matter with Mrs. Giurbino, who insisted that the account be opened in her own name. Further, Gore stated that when Mrs. Giurbino changed the account to a P.O.D. account with Tina as the beneficiary, Mrs. Giurbino was by herself and told Gore that she did not want her son's name on the account. Mrs. Giurbino did not appear coerced, her demeanor was the same as always, and she was very adamant about what she wanted. Finally, Gore testified that she took care of the transaction on August 16. Gore testified that she believed Connie Christian, the decedent's granddaughter, was present. Mrs. Giurbino endorsed the check in front of Gore, and Gore stated that Mrs. Giurbino's demeanor was no different when compared to her demeanor at other transactions: Mrs. Giurbino was calm, cool and collected.

Anne Caniglio, decedent's cousin and long-time friend, testified next for appellant. Caniglio testified that Mrs. Giurbino both praised and "ran down" her son Sam from 1988 up to her death in September 1990. Caniglio stated that Sam and his son Perry took care of the decedent after her other son, Ross, passed away. Caniglio stated that the decedent was not a chronic complainer, but, after Memorial Day 1990, accused Sam of stealing her bank book and jewelry. Caniglio also stated that the decedent accused her granddaughter Connie of stealing jewelry. Caniglio testified that after Memorial Day, the decedent's demeanor had changed to the point where she no longer trusted anyone. On cross-examination, Caniglio stated that the decedent did say that Connie helped her a number of times and that the decedent remained close to her son Ross's ex-wife, Angie Fiorelli.

Kathleen Dolan, the former head teller at Broadview Savings and Loan at the West 41st Street and Clark Avenue branch, testified that she knew Mrs. Giurbino as a bank customer. Mrs. Giurbino came into Broadview Savings approximately

---

1. Although the instant account number is 19–1–02991–3 on the signature card which opened the account and on the two passbooks, it is not contested that the deposit slip listing the account as number 19–1–29913 is, in fact, a deposit slip for the P.O.D. account in question.

once a week, usually to withdraw money or pay bills. Dolan handled the August 16th transaction, which closed two savings accounts (account No. 04–342396 and account No. 04–130239), which were held in Mrs. Giurbino's name and in her son's name, Salvatore Giurbino, a.k.a. Sam Giurbino, and held with joint and survivorship rights. Dolan testified that Mrs. Giurbino had wanted to close the accounts out for quite a while, but that she talked Mrs. Giurbino out of it. Although Dolan's recollection of the instant transaction is somewhat sketchy, she stated that she believed Mrs. Giurbino was most likely sitting down in front of the teller line while another woman made the transaction for her. In any event, Mrs. Giurbino had to have been in the bank, otherwise Dolan would not have made the transaction. Dolan further testified that Mrs. Giurbino would have had to sign the withdrawal slips and that she would not accept a withdrawal slip if someone else had signed it. The standard procedure when elderly are not able to sign a withdrawal slip is to have the person mark an "X" and have two tellers witness it. The relevant withdrawal slips are contested by appellant as being forgeries and are signed "Connie Giurbino." On cross-examination, Dolan testified that Mrs. Giurbino wanted to close the two accounts because she thought her son was stealing money.

Vickie Willard, a forensic document examiner with fifteen years of experience and countless court appearances as an expert witness, testified next for appellant. Willard compared various other documents containing Mrs. Giurbino's undisputed signature with the signature contained on the two withdrawal slips presented to Dolan at Broadview Savings and came to the conclusion that, in her opinion, the two signatures written on the disputed withdrawal slips were not written or signed by Mrs. Giurbino.

Perry Giurbino, Sam's son and grandson of the decedent, testified to having helped his father on numerous occasions cut the decedent's grass and visit with her at her home. Perry also testified to an incident where he, his father and his brother-in-law Bob Zimmerer (who is married to Sam's daughter Connie Zimmerer) were present at the decedent's house and tried to talk her into going to the doctor. Perry testified that the decedent was not acting right and was accusing his father Sam and his cousin Connie of stealing her bankbook and jewelry. The next day, Perry returned to his grandmother's only to find Connie going through her drawers. Perry asked her if she had found the bank book, but she only replied that it was none of his business. It is not disputed that Sam and his side of the Giurbino family never got along with Ross and his side of the family. Perry stated that Connie began ranting and raving about her grandmother's not living in an assisted-living facility. Perry was asked to leave by his grandmother soon after arriving. Perry stated that his grandmother never spoke to him that way and that a few days later, when he returned to cut the grass, his grandmoth-

er acted like nothing had ever happened. Perry testified that his grandmother and father had a good relationship until 1990. After his grandmother's hospitalization in May, she continued to accuse his father of entering her home at night and stealing her belongings. On cross-examination, Perry admitted that Connie may have spent more time with his grandmother than he did. He also stated that his grandmother was very upset with his father because she was not happy with her decision to deed her house to Sam.

Connie Christian testified next as if on cross-examination. Christian stated that she visited with her grandmother approximately once per week and would frequently take her grocery shopping or out to eat. She also took the decedent to the Broadview Savings and Loan on numerous occasions. Christian was with Mrs. Giurbino on August 16 when Mrs. Giurbino closed her accounts at Broadview Savings and deposited the check into the account at First Federal. Christian testified that she went along with her grandmother because her grandmother asked her to. Christian also testified that her grandmother stated she wanted Sam's name off the account. Christian testified that her grandmother signed the disputed withdrawal slips herself, and she denied having signed the slips for her grandmother.

Christian and her grandmother then went to First Federal and sat at Gore's desk. Christian stated she knew her grandmother wanted to put the money into another account, but did not know what type of account or that Tina was the P.O.D. beneficiary on said account. Christian watched as her grandmother endorsed the check and found out later that day who the P.O.D. beneficiary was.

With respect to the disputed signatures found on the two withdrawal slips, Christian stated that the decedent had signed many other documents that day and was tired of writing. She felt this could account for the difference in the decedent's signature as found on the disputed withdrawal slips when compared to other documents which the decedent had signed.

Christian also testified to an earlier event at attorney Ernest Fabian's office. In February or March 1990, Christian, her brother Anthony Giurbino, and the decedent went to Fabian's office to inquire about the decedent's will and a quitclaim deed to her house which Fabian had drawn up. When Fabian explained to Mrs. Giurbino that she had signed a quitclaim deed to her house to Sam but reserved a life estate to herself, she became furious and called Sam and Fabian crooks. Furthermore, the will left all of decedent's assets to Sam except some jewelry which would be divided between the granddaughters. Ross's sons were no longer in decedent's will. Prior to the probated will, Ross's sons were also beneficiaries under the will.

Carla Zimmerer, Sam's daughter, and Geraldine Giurbino, Sam's wife, both testified to incidents in which the decedent complained to them about either Sam's or Connie's trying to steal her belongings.

Sam testified last on his own behalf. Sam stated that he had a good relationship with his mother and took care of her during the last twenty-seven years after his father passed away. Sam testified that he cut the grass, shopped for her, and performed various household tasks.

Sam testified that he took his mother to Fabian's office to have her will changed because she did not want to leave anything to Ross's boys. She also wanted to quitclaim her house to Sam in order to avoid probate.

Sam stated that he observed a gradual decline in his mother during the last year of her life. Sam described his mother as a very sick woman who, by August 16, 1990, was "crazy." On cross-examination, Sam admitted that despite her two hospitalizations, there was never any recommendation by any doctor to have his mother placed in a guardianship. Sam also testified that his mother lived by herself, shopped for herself, and cooked for herself. However, Sam believed that his mother was able to cook and clean for herself out of instinct or habit. Sam stated that he had neighbors watching out for his mother and that his mother would open the shutters in the morning and close them at night to signify that she was all right. Further, his mother began accusing Sam of stealing her belongings after the incident with the deed to the house.

Sam blamed Connie for going to his mother and stirring up trouble about the quitclaim deed. He stated that his mother merely forgot that she had quitclaimed the house to him despite understanding at the time what she was doing.

Appellant then rested his case subject to the admission of evidence.

Angela Fiorelli, Ross's ex-wife, testified first for appellees. Fiorelli maintained a good relationship with Mrs. Giurbino after her divorce from Ross and despite her subsequent remarriage. Fiorelli stated she was the daughter Mrs. Giurbino never had. Fiorelli testified that Mrs. Giurbino told her that Sam had pressured her into making a new will and quitclaiming the house to him. She asked Fiorelli and her new husband to take her to see a lawyer, but Fiorelli stated they had refused. Fiorelli stated that Mrs. Giurbino told her that when she went to attorney Fabian's office, she was under the impression that the house was going into Sam's name only when she died to save probate expenses.

Ross Giurbino, Jr., Tina's father, also testified at the referee's hearing. Ross stated that Tina would see Mrs. Giurbino when the entire family got together for holidays or on other occasions. Ross Giurbino, Jr. first learned of the P.O.D. account, and that Tina was its beneficiary, the day of his grandmother's funeral.

Based on the above evidence, the referee recommended that the account in question be declared a valid P.O.D. account and not proceeds of the estate. Appellant duly filed objections to the referee's report and a supplemental objection to such report; however, the probate court, after reviewing the entire record, declared the account a valid P.O.D. account for the benefit of Tina Giurbino and found that the proceeds of the P.O.D. account were not proceeds of the estate. The court, therefore, dismissed appellant's complaint. Appellant timely appeals, raising the following assignments of error for our review:

"I. Judgment is against the provisions of Ohio Revised Code 2131.10 and Ohio Revised Code 1107.08(B).

"II. Judgment is manifestly against the weight of the evidence of incompetency.

"III. Judgment is manifestly against the evidence of forgery.

"IV. The court erred by failing to rule on the appellant's objections and supplemental objections to the report of the referee, pursuant to Ohio Civil Rule 53(E)(2), (4) and (6).

"V. The court erred by failing to make separate findings of fact and conclusions of law, pursuant to Ohio Civil Rule 52.

"VI. Judgment is contrary to law.

"VII. The court denied plaintiff-appellant his demand for a jury trial."

I

■ In appellant's first assignment of error, appellant argues that the judgment is contrary to R.C. 2131.10 and 1107.08(B). Appellant contends that because First Federal's signature card changing the instant savings account to a P.O.D. account does not contain Mrs. Giurbino's signature, the P.O.D. account was not properly opened and the proceeds of the check deposited therein are an asset of the estate. Appellant states that because Mrs. Giurbino could not place her signature authorizing the change of ownership on the signature card, then apparently she was not competent to enter into the contract changing ownership of the account. Finally, appellant posits that there was no meeting of the minds between First Federal and Mrs. Giurbino and, therefore, the account is void.

R.C. 1107.08(B) provides:

"A bank may enter into a written contract with a natural person whereby the proceeds of such person's deposit may be made payable on his death to another person in accordance with the terms, restrictions, and limitations set forth in sections 2131.10 and 2131.11 of the Revised Code."

R.C. 2131.10 provides in pertinent part:

"A natural person, adult or minor, referred to in sections 2131.10 and 2131.11 of the Revised Code as the owner, may enter into a written contract with any bank, building and loan or savings and loan association, credit union, or society for savings, authorized to receive money on an investment share certificate, share account, deposit, or stock deposit, and transacting business in this state, whereby the proceeds of the owner's investment share certificate, share account, deposit, or stock deposit may be made payable on the death of the owner to another natural person or to any entity or organization, referred to in such sections as the beneficiary, notwithstanding any provisions to the contrary in Chapter 2107. of the Revised Code. In creating such accounts, 'payable on death' or 'payable on the death of' may be abbreviated to 'P.O.D.'

" * * *

"No change in the designation of the beneficiary shall be valid unless executed in the form and manner prescribed by the bank, building and loan or savings and loan association, credit union, or society for savings."

Although R.C. 1107.08(B) and 2131.10 require a "written contract" in order to establish a valid P.O.D. account, neither statute defines "written contract." Additionally, it is contended that because a P.O.D. account allows a person to make a testamentary disposition of assets, the "written contract" must be, at the very least, signed by the testator, evidencing her intent. *Witt v. Ward* (1989), 60 Ohio App.3d 21, 573 N.E.2d 201, paragraphs three and four of the syllabus, supports this proposition. However, *Witt* expressly recognizes that the formalities of the Statute of Wills need not be followed. *Id.* at paragraph four. Moreover, this court has previously recognized that the formalities of the Statute of Wills need not be followed in opening a valid P.O.D. account. In *Eger v. Eger* (1974), 39 Ohio App.2d 14, 68 O.O.2d 150, 314 N.E.2d 394, paragraph seven of the syllabus, we held:

"A payable on death (P.O.D.) account created under R.C. 2131.10 is one where funds are made payable upon the death of the owner to another *without the documents having complied with the formalities of the Statute of Wills.* The funds involved do not become part of the decedent's estate. In a P.O.D. account the owner retains sole ownership of the account and only he may withdraw the proceeds or change the beneficiary during his lifetime. The beneficiary's interest does not vest until the death of the owner." (Emphasis added.) See, also, *Tonsic v. Holub* (1968), 13 Ohio App.2d 195, 42 O.O.2d 341, 235 N.E.2d 239, syllabus.

The establishment of a valid P.O.D. account is a matter of contract between the person establishing the account and the relevant financial institution. R.C. 2131.10 states that a change in the beneficiary is to be executed in a form

and manner prescribed by the bank. In the present case, a written contract exists between Mrs. Giurbino and First Federal, which is not signed by Mrs. Giurbino as required by the bank. Instead, Gore testified, as the assistant branch manager, that she had the bank's authority to mark "Okay, too hard for customer to sign" in the place required for Mrs. Giurbino's signature. Gore testified as to the bank's intent to establish a valid P.O.D. account and that it was Mrs. Giurbino's intent to open such account. Based on the testimony of Gore, we conclude that the requisite meeting of the minds was present to form a contract establishing a valid P.O.D. account. Gore and Christian also testified as to Mrs. Giurbino's intent to establish a valid P.O.D. account.

Accordingly, appellant's first assignment of error is overruled.

## II

In appellant's second assignment of error, appellant argues that the judgment is against the manifest weight of the evidence on the issue of Mrs. Giurbino's competence. In support of this assignment of error, appellant argues that Mrs. Giurbino was a gravely sick person suffering from a malignant brain tumor and was confused, short of memory, and experiencing mental disorder.

As previously stated, a P.O.D. account is a matter of contract between the person opening the account and the relevant financial institution. As such, principles of contract law apply to determine Mrs. Giurbino's capacity to enter into a contract. It is well settled that a party seeking to void a contract because of lack of mental capacity has the burden of proof by clear and convincing evidence. *Willis v. Baker* (1906), 75 Ohio St. 291, 79 N.E. 466; *DiPietro v. DiPietro* (1983), 10 Ohio App.3d 44, 10 OBR 52, 460 N.E.2d 657; and *Washkewicz v. Seredick* (Oct. 13, 1988), Cuyahoga App. No. 54595, unreported, 1988 WL 113013. The proper test for mental competency to contract is whether the person claimed to be incompetent understood the nature of the transaction and the effects of his or her own actions. *Washkewicz, supra,* citing *Ford v. Bachman* (App.1938), 26 Ohio Law Abs. 620, 11 O.O. 475, 32 N.E.2d 511. The above test for contractual capacity is similar in nature to the test used in Ohio for determining testamentary capacity. Further, because a P.O.D. account does provide a vehicle for a person to make a testamentary disposition, the test for testamentary capacity should be considered. Testamentary capacity exists where the testator has sufficient mind and memory (1) to understand the nature of the business in which he is engaged, (2) to comprehend generally the nature and extent of his property, (3) to hold in his mind the names and identities of those who had natural claims upon his bounty, and (4) to be able to appreciate his relation to members of his family. *Niemes v. Niemes* (1917), 97 Ohio St. 145, 119

N.E. 503; *Taylor v. Garinger* (1986), 30 Ohio App.3d 184, 30 OBR 326, 507 N.E.2d 406.

In the present case, the referee found that appellant failed to prove that the decedent was mentally incapable of creating a contract for a P.O.D. account. We will make every reasonable presumption in favor of the trial court's judgment. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273. The underlying rationale for giving deference to the findings of the trial court rests with the knowledge that the trial court is best able to view witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Id.;* see, also, *Shore, Shirley & Co. v. Kelley* (1988), 40 Ohio App.3d 10, 531 N.E.2d 333. Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578.

Although it readily appears that Mrs. Giurbino may have been suffering from the effects of a brain tumor, this court cannot say that the trial court's judgment finding that appellant failed to prove her incompetence is against the manifest weight of the evidence. Mrs. Giurbino's own treating physician provides the most compelling testimony. While Dr. Weiss testified that Mrs. Giurbino suffered from short-term memory loss and was diagnosed with dementia with depression, Dr. Weiss opined that Mrs. Giurbino was capable of living alone and caring for herself. Dr. Weiss also stated that the fact that a person is demented does not rule out that he or she is capable. Finally, Dr. Weiss was unable to render an opinion as to whether Mrs. Giurbino was competent to handle financial matters or whether she was competent during the August 16th transaction. Dr. Weiss stated that he could only surmise as to her competence. Finally, the testimony of Gore and Christian indicates that Mrs. Giurbino's demeanor was unchanged during the transaction and that she knew that she did not want her son, Sam, on the account. In sum, this court simply cannot conclude that the trial court's decision finding that appellant failed to prove that Mrs. Giurbino was incompetent to enter into a contract or dispose of her property was against the manifest weight of the evidence.

Appellant's second assignment of error is, therefore, overruled.

### III

In appellant's third assignment of error, appellant argues that the verdict is against the manifest weight of the evidence on the issue of forgery. Appellant argues that the evidence clearly demonstrates that Mrs. Giurbino's signature

found on the withdrawal slips from August 16, closing out accounts Nos. 04–342396 and 04–130239, were forged.

Forgery is proscribed by R.C. 2913.31, which states:

"(A) No person, with purpose to defraud, or knowing that he is facilitating a fraud, shall do any of the following:

"(1) Forge any writing of another without his authority;

"(2) Forge any writing so that it purports to be genuine when it is actually spurious, or to be the act of another who did not authorize that act, or to have been executed at a time or place or with terms different from what was in fact the case, or to be a copy of an original when no such original existed;

"(3) Utter, or possess with purpose to utter, any writing which he knows to have been forged."

Appellant points to the testimony of his expert witness, Willard, who opined that said withdrawal slips were not signed by Mrs. Giurbino. Connie Christian testified that she went with Mrs. Giurbino to Broadview Savings and Loan and that Mrs. Giurbino did, in fact, sign the withdrawal slips. The testimony further reveals, and it is not contested, that Mrs. Giurbino received an official bank check upon closing the two savings accounts, which she later endorsed and deposited into her P.O.D. account at First Federal. Gore and Christian both testified that Mrs. Giurbino intended to deposit the check into the P.O.D. account. At that time, Mrs. Giurbino was the sole owner of these funds and could do with them what she wanted. *Eger, supra.* Therefore, there is no evidence in the record to support appellant's argument that Mrs. Giurbino's signature was forged without her consent or that she did not authorize her signature to appear on the withdrawal slip. Assuming, *arguendo*, that her signature was "forged," Mrs. Giurbino retained control and ownership over these funds after the "forgery." Thus, the alleged "forgery" is of no consequence.

Accordingly, appellant's third assignment of error is overruled.

## IV

In appellant's fourth assignment of error, appellant argues the trial court erred in failing to rule on appellant's objections and supplemental objections to the referee's report. In support of this assignment of error, appellant contends that the final judgment of the probate court was merely a general ruling and not specifically directed to appellant's objections and supplemental objections. A review of the final order dismissing appellant's complaint reveals that the probate court did not specifically rule on appellant's objections although the probate court did render its decision "after reviewing the entire record."

Civ.R. 53(E)(2) provides, in pertinent part, that "[u]pon consideration of the objections, the court may adopt, reject, or modify the report; hear additional evidence; return the report to the referee with instructions; or hear the matter itself." Citing to *Garcia v. Tillack* (1983), 9 Ohio App.3d 222, 9 OBR 372, 459 N.E.2d 918, syllabus, for the proposition that the probate court is required to review the referee's report and make an independent analysis of the underlying facts involved in the dispute, appellant argues that the trial court failed to review his objections and supplemental objections. This argument is not supported by the record. In two journal entries dated December 4, 1991, the probate court writes, "The objection (supplemental objection) to the report of the referee is this day heard and submitted to the court." Thereafter, on December 16, 1991, the trial court journalized its judgment entry dismissing appellant's complaint based on a review of the "entire record." Finally, the probate court's findings contained in its judgment entry mirrored those findings in the referee's report. Accordingly, the record adequately demonstrates that the trial judge of the probate court considered appellant's objections and supplemental objections notwithstanding the probate court's failure to specifically rule on them.

Appellant's fourth assignment of error is accordingly overruled.

## V

■ In appellant's fifth assignment of error, appellant argues the trial court committed reversible error in failing to make separate findings of fact and conclusions of law pursuant to Civ.R. 52.

■ The purpose behind separate findings of fact and conclusions of law is that it aids the appellate court in its review of the trial court's decision, it clarifies the issues for potential *res judicata* and estoppel application, and it ensures care in preparation of the trial court's final judgment. *In re Adoption of Gibson* (1986), 23 Ohio St.3d 170, 174, 23 OBR 336, 338, 492 N.E.2d 146, 148–149 (Douglas, J., concurring in part and dissenting in part). In *Dunson v. Aldrich* (1988), 54 Ohio App.3d 137, 561 N.E.2d 972, the court of appeals held, at paragraph six of its syllabus:

"A trial court does not abuse its discretion when it fails to make separate findings of fact and conclusions of law pursuant to a Civ.R. 52 motion, but instead issues an order adopting the findings and conclusions of the court's referee."

In the present case, the probate court considered the entire record, including the referee's report and appellant's objections, and rendered its decision. The probate court's findings mirrored those of the referee. Moreover, the referee's report and recommendations is nine pages in length and contains a well-written summary and analysis of the evidence presented. We, therefore, have a more

than adequate record upon which to conduct our review and overrule appellant's fifth assignment of error.

## VI

Appellant's sixth assignment of error argues that the trial court's judgment is contrary to law. Appellant summarily restates his arguments contained in his prior assignments of error and requests a reversal. This assignment of error is overruled on the basis of our decision and analysis stated in appellant's first through fifth assignments of error.

## VII

In appellant's final assignment of error, appellant argues the trial court committed reversible error when it denied his demand for a jury trial.

This court has previously determined the issue concerning questions of fact presented to the probate courts. In *Bobko v. Sagen* (1989), 61 Ohio App.3d 397, 407, 572 N.E.2d 823, 829–830, we wrote:

"The determination of questions of fact presented to the probate court is governed by R.C. 2101.31, which provides as follows:

" 'All questions of fact shall be determined by the probate judge, unless he orders them tried by a jury, or referred, as provided in sections 2101.06 and 2101.07, and sections 2315.26 to 2315.37, inclusive, of the Revised Code.'

"Where an action for declaratory judgment is properly instituted in the probate court, this code provision is applicable, and questions arising out of the trial of the issues shall be determined by the probate judge unless upon his own initiative or request of either party, the probate judge shall, in the exercise of his discretion, order such questions of fact to be tried by a jury or referred as otherwise authorized in the statutes. *Renee v. Sanders* (1953), 160 Ohio St. 279, 52 O.O. 175, 116 N.E.2d 420, paragraph five of the syllabus.

"This rule applies despite language in R.C. 2311.04 which provides that issues of fact arising in actions for the recovery of real or personal property shall be tried by a jury. *Id.* at 285, 52 O.O. at 177, 116 N.E.2d at 424, construing G.C. 11379, the identical forerunner of R.C. 2311.04, and G.C. 10501–32, the predecessor to R.C. 2101.31.

"In addition, R.C. 2721.10, which guarantees litigants the right to have issues of fact presented in declaratory judgment actions determined in the same manner as issues of fact are generally determined by the court hearing the action, does not contradict this rule. *Renee,* 160 Ohio St. at 283, 52 O.O. at 176, 116 N.E.2d at 423.

"For the foregoing reasons, we cannot conclude that the trial court abused its discretion in denying defendants' demand for a jury trial in this action. Accord *In re Estate of Dachman* (June 13, 1985), Cuyahoga App. No. 49056, unreported, 1985 WL 6844."

Based on the foregoing, appellant's final assignment of error is overruled. The judgment of the probate court is affirmed.

*Judgment affirmed.*

BLACKMON, P.J., and HARPER, J., concur.