WALLBROWN et al.

v.

KENT STATE UNIVERSITY et al.; Blaha, Appellee; Warren, Appellant.

[Cite as *Wallbrown v. Kent State Univ.* (2001), 143 Ohio App.3d 762.]

Court of Appeals of Ohio,
Eleventh District, Portage County.

No. 99–P–0095.

Decided June 4, 2001.

*Sandvoss & Lentz* and *Norman W. Sandvoss,* for appellee.

*Thompson, Hine & Flory* and *Kenneth D. Myers,* for appellant.

CHRISTLEY, Judge.

Appellant, Jacqueline Y. Warren, brings this appeal from the judgment of the Portage County Court of Common Pleas granting appellee John Blaha's motion for directed verdict pursuant to Civ.R. 50(A) following a bench trial. For the reasons adduced below, the judgment of the trial court is affirmed.

This case involves a dispute over entitlement to certain life insurance proceeds after the death of Fred H. Wallbrown ("the decedent"). Appellee and appellant were named as defendants in an action filed by plaintiffs, Jane D. and Eulis Sheldon Downs Wallbrown ("Jane and Eulis Wallbrown"), a former wife and son of the decedent. In their complaint, plaintiffs sought declaratory judgment with respect to the life insurance proceeds.

Subsequently, appellee brought a cross-claim against appellant for declaratory judgment contending that he was the only beneficiary to the decedent's life insurance proceeds. In response, appellant filed a reply to the cross-claim asserting, among other things, that any change in beneficiary was invalid because undue influence was involved.

Eventually, the trial court granted summary judgment in favor of appellee against the plaintiffs, which resulted in the dismissal of their claim. This court affirmed that decision of the trial court in *Wallbrown v. Kent State Univ.* (May 1, 1998), Portage App. No. 97–P–0031, unreported, 1998 WL 258172.

However, appellee's cross-claim remained because the trial court denied appellee's motion for summary judgment on his claim for declaratory judgment as against appellant. Consequently, this led appellant and appellee to proceed towards a bench trial.

The following facts were presented at trial and briefly summarize the circumstances surrounding this case. The decedent, who had a Ph.D. in school psychology, was a college professor at Kent State University, where he taught psychology courses. On September 23, 1993, the decedent, a colorful soul, married appellant, his fifth wife. Days later, on September 27, 1993, the decedent changed the beneficiary of his life insurance policy from his son to appellant.[1]

The decedent's health was in decline, as he was suffering from emphysema and severe chronic obstructive pulmonary disease. He entered the Cleveland Clinic on October 28, 1993, but was discharged shortly thereafter on November 9, 1993.

---

1. This document is reflected in Joint Exhibit B. The record reflects that the parties stipulated that this change of beneficiary form contained a valid signature of the decedent. However, the parties did not stipulate to its overall validity.

The decedent returned to the Cleveland Clinic for a second hospital stay on December 8, 1993, and was later discharged on December 17, 1993.

The controversy surrounding the life insurance proceeds occurred on December 17, 1993, the second time the decedent was discharged from the hospital. On that day, the decedent changed the named beneficiary from appellant to appellee, his close friend for nearly thirty years.[2]

After appellant presented evidence and testimony to the court, appellee moved for a directed verdict on the basis that no fiduciary relationship existed between appellee and the decedent, and that undue influence had not been established. Upon consideration, the trial court denied appellee's motion on the record:

"THE COURT: I think the first issue I have to address as a judge is whether or not there was a fiduciary or confidential relationship. * * *

"There is no question this is not a fiduciary relationship—moral, social, domestic or merely personal in nature.

"I think the [appellee] has established they [appellee and the decedent] were good friends, that he came up here to help him leave the hospital and to change certain aspects of his personal estate. But there has been absolutely no evidence that this Court can find that he didn't do the act of changing the policy beneficiary on his own. It's not like he [appellee] took him [the decedent] back to Virginia and sat there for a month and then he signed the papers over.

"But reading this case troubles me in that there is some evidence of a confidential relationship between these parties. So I think I am going to put you [appellee] to your burden, I'll overrule the motion at this point."

Appellee then proceeded to present his case. At the conclusion of the evidence, appellee renewed his motion for a directed verdict. Based upon the testimony and evidence presented at the bench trial, the trial court granted appellee's motion for directed verdict on the record for the following reasons:

"Well, this Court wanted to hear all of the evidence, this Court cannot find there has been any proving whatsoever of improper influence, either exerted or attempted by Mr. Blaha [appellee]. I have no medical testimony this man [the decedent] was in any way incompetent.

"Therefore, the Court will grant your Rule 50 motion."

---

2. According to the testimony presented at the bench trial, although the change of beneficiary form for the life insurance policy was actually signed on December 17, 1993, Joint Exhibit A indicates that the decedent mistakenly dated the form as December 16, 1993. Again, without stipulating to its overall validity, the parties stipulated that this document contained the valid signature of the decedent.

The trial court's decision was reflected in a judgment entry dated September 29, 1999.[3] From this judgment, appellant filed a notice of appeal and presented the following assignments of error for our consideration:

"[1.] The trial court erred in granting a directed verdict to appellee John Blaha and granting appellee the right to the life insurance policy at issue when the decedent had a confidential relationship with appellee, when decedent lacked the capacity to make a decision to change his life insurance beneficiary and decedent was unduly influenced to make such a change.

"[2.] The trial court erred by not invoking its equitable powers to award at least part of the life insurance proceeds to appellant."

■ Before we may consider the merits of this case, a procedural matter must be addressed. Although neither party raises this issue, we note at the outset that appellee made the wrong motion because a motion for directed verdict under Civ.R. 50(A) applies only to actions tried to a jury, not a court. Instead of granting appellee's incorrect Civ.R. 50(A) motion for directed verdict, the trial court should have simply stated that because no evidence of undue influence was presented, judgment would be entered in favor of appellee. Nevertheless, we find this to be harmless error, as it is clear from the record and judgment entry that the trial court intended to rule in favor of appellee on the basis that undue influence and incapacity were not established.

We turn now to the merits of this case. Under the first assignment of error, appellant contends that the trial court erred in finding appellee to be the proper beneficiary because a presumption of undue influence existed, and the trial court never shifted the burden of proof to appellee to show that the transaction was proper.

According to appellant, the decedent was totally reliant on appellee for all of his needs, and, as a result, a confidential relationship existed between them. Furthermore, appellant argues that the change of beneficiary was done in a great hurry with no witnesses and at a time when the decedent was in terrible physical health and on hallucinogenic medications. As for a tape recording made by the decedent before he died, appellant suggests that this tape demonstrates that the decedent was paranoid and illogical.

---

**3.** The September 29, 1999 judgment entry incorrectly states that appellee "moved to *dismiss* the claim of [appellant]" and that the trial court "found the motion was well taken and the claim of [appellant was] hereby dismissed." (Emphasis added.) A review of the bench trial transcript reveals that at the close of all the evidence, appellee renewed his motion for *directed verdict.* After hearing arguments, the trial court granted appellee's Civ.R. 50 motion on the record.

In this assignment of error, appellant essentially argues that the judgment of the trial court was contrary to law, as the court failed to shift the burden of proof to appellee, and that the judgment was also against the manifest weight of the evidence. An appellate court will not reverse the judgment of the trial court if the decision is supported by some competent, credible evidence going to all essential elements of the case. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280, 8 O.O.3d 261, 262, 376 N.E.2d 578, 579. This standard rests on the strong presumption that the trial court, as the trier of fact in this matter, is in the best position to weigh the evidence presented, assess the credibility of the witnesses, and make an informed factual determination therefrom. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410–411, 461 N.E.2d 1273, 1276.

In the present matter, appellant accused appellee of exerting undue influence upon the decedent.[4] In order to sustain an allegation of undue influence, appellant must prove the following: "(1) a susceptible party; (2) another's opportunity to exert influence; (3) the fact of improper influence exerted or attempted; and (4) the result showing the effect of such improper influence." *Lah v. Rogers* (1998), 125 Ohio App.3d 164, 171, 707 N.E.2d 1208, 1212. Moreover, an inquiry into whether undue influence is present involves a two-step analysis: (1) whether the transaction was the result of influence brought to bear upon the susceptible party and (2) whether that influence was actually undue. *Id.*

However, if a confidential relationship existed between the decedent and appellee, then a presumption of undue influence arises, and "[t]he burden of going forward with evidence would then shift to appellee to show the absence of undue influence." *Thorp v. Cross* (Oct. 16, 1998), Portage App. No. 97–P–0079, unreported, at 14. This court further explained in *In re Guardianship of Blumetti* (Jan. 14, 1994), Trumbull App. No. 92–T–4752, unreported, 1994 WL 45250, at *2–3:

" 'Where a confidential * * * relationship exists between a donor and donee, the transfer is looked upon with some suspicion that undue influence may have been brought to bear on the donor by the donee.' *Studniewski v. Krzyzanowski* (1989), 65 Ohio App.3d 628, 632 [584 N.E.2d 1297, 1300].

"In such cases, a presumption of undue influence arises and the burden of going forward with evidence shifts to the donee to show that his conduct was free of undue influence or fraud and that the donor acted voluntarily and with a full

---

4. Undue influence is an affirmative defense under Civ.R. 8(C). *Young v. Young* (1982), 8 Ohio App.3d 52, 54–55, 8 OBR 56, 57–59, 455 N.E.2d 1360, 1361–1363.

understanding of his act and its consequences. \* \* \* The donee may rebut the presumption of undue influence by a preponderance of the evidence. \* \* \*" (Citations omitted.)

■ "A confidential relationship can be moral, social, domestic, or merely personal in nature." *Thorp* at 13. As such, a confidential relationship exists "whenever trust and confidence is reposed by one person in the integrity and fidelity of another." *George v. Zink* (May 23, 1997), Lake App. No. 96–L–132, unreported, 1997 WL 286204, at \*3.

■ With this in mind, we examine the case at bar. The following facts were adduced at trial to establish a confidential relationship between appellee and the decedent. Appellee, a licensed psychologist in Ohio and Virginia, taught psychology at George Mason University in Fairfax, Virginia. He and the decedent met in 1967, when they were both working for Ohio State University and were graduate students working towards a Ph.D.

Appellee and decedent had a thirty-year friendship. At trial, appellee described their relationship as that of best friends. In contrast, appellant, a psychologist with a Ph.D. in counseling psychology, characterized appellee as merely being an acquaintance, not a friend, of the decedent.

At times, the decedent spoke to appellee about his domestic affairs regarding his wives and children. However, the decedent never really spoke about his financial affairs to appellee. Each gave the other advice, and each trusted the other's opinion. Although appellee resided in Virginia while the decedent remained in Ohio, the two corresponded through the telephone or by writing. Appellee talked with the decedent quite frequently on the phone, usually biweekly.

Appellee was aware of the decedent's health problems, as well as his hospitalizations. When the decedent was hospitalized for lung disease from October 28 to November 9, 1993, appellee talked with him on two or three occasions.[5] Appellee became aware of the decedent's second hospitalization in December 1993, when the decedent telephoned appellee to inform him that he was readmitted to the Cleveland Clinic. During this conversation, the decedent confided in appellee and told him that appellant was treating him badly and that he wanted

---

5. During his first stay at the Cleveland Clinic, the hospital discharge summary record indicated that the decedent "developed an altered mental status secondary to sleep deprivation and large doses of Haldol [were] used for sedation in ICU. Following sleep, [the decedent] more or less returned to his baseline mental status. \* \* \* Upon discharge, the patient was in *good condition,* his lungs clear, and *his mental status had returned to normal baseline condition."* (Emphasis added.) This document was admitted into evidence as appellant's Exhibits A and B.

to get her "off of his major assets." According to appellee, the decedent claimed that appellant left him without food or water for three days after he came home from the hospital.

Furthermore, the decedent turned to appellee for help because his wife would not make arrangements to pick him up from the hospital. As a result, the decedent asked appellee to pick him up and take him to appellee's home in Virginia. Appellee honored this request and traveled to Ohio to pick up the decedent at the hospital.

While the decedent remained at appellee's home, he made a tape recording known as the "Thanatos Tape." The tape recording was apparently named after the Greek God of Death because it was to be listened to only upon the decedent's death. Upon listening to the tape, it is evident that the decedent and appellee had a close relationship:

" * * * Consequently, I called, my very close friend Dr. John Blaha, made arrangements for him to be available to pick me up at the time I was discharged from Cleveland Clinic. * * * I, want to be very clear about this, I want to be very clear about the fact, that I would have been abandoned and would have had to been taken to a nursing home or some kind of halfway house or hospice, had it not been for my friend John Blaha. It's very very important to me, that in terms of consideration of my estate, that Dr. Blaha be adequately reimbursed for the time and the effort that he has invested in my care because without his care I would have been totally left in unbearable physical and mental state. In fact, I don't have the slightest idea of what would have happened to me. There were a few other people I could have stayed with for a short period of time, but those things simply can't go on forever, and in John's case, he will stick with me what ever time it takes. * * * "

Eventually, in April 1994, the decedent returned to the Cleveland area to live with appellant. Between April 1994 and the decedent's death in May 1995, appellee had frequent contact with the decedent.

Based on the above-mentioned facts and circumstances, we conclude, as did the trial court, that a confidential relationship existed between appellee and appellant. Appellee and the decedent had a close relationship where each confided and helped the other and trusted the other's opinion. Consequently, appellee had the burden of going forward by presenting a preponderance of evidence to establish that his conduct was free of undue influence or fraud, and that the decedent acted voluntarily and with a full understanding of his acts and their consequences. *Blumetti* at *2–3. However, appellant still retained the ultimate burden of proving undue influence by clear and convincing evidence. *Studniewski* at 632, 584 N.E.2d at 1300–1301.

In the case at hand, the trial court properly recognized the shifting of this burden of proof when it considered appellee's initial motion for a directed verdict at the close of appellant's case:

"THE COURT: I think the first issue I have to address as a judge is whether or not there was a fiduciary or confidential relationship.  * * *

"I think the [appellee] has established they [appellee and the decedent] were good friends, that he came up here to help him leave the hospital and to change certain aspects of his personal estate.  But there has been absolutely no evidence that this Court can find that he didn't do the act of changing the policy beneficiary on his own.  It's not like he [appellee] took him [the decedent] back to Virginia and sat there for a month and then he signed the papers over.

"But reading this case troubles me in that *there is some evidence of a confidential relationship between these parties.  So I think I am going to put you [appellee] to your burden,* I'll overrule the motion at this point."  (Emphasis added.)

In the instant matter, the evidence adduced at the bench trial demonstrated that the decedent was not a susceptible individual, but, rather, was lucid, mentally competent, and capable of making his own decisions.  Appellant described her husband as being very irritable, moody, afraid of dying, and speaking in a "disjointed" manner.  However, we note that common sense tells us that while these traits may accompany incompetence, they are not exclusive to such a state.  Other witnesses, such as appellee, Blanche Ellen Mills ("Blanche"), and Ellen E. Mills ("Ellen"), remarked that the decedent was lucid and had an independent and strong-willed personality.[6]

For instance, appellee described the decedent as being "extremely independent minded throughout his life.  He always made his own decisions.  * * * [V]irtually all of those decisions were good decisions."  While the decedent may have been physically weak, appellee indicated that he was not weak mentally:  "He [the decedent] was as sharp as ever mentally."

In addition, Blanche confirmed that the decedent had a very pleasant and open personality, was strong-willed, and spoke his mind.[7]  When Blanche received a phone call from the decedent on December 17, 1993, telling her that he was going to Virginia with appellee, she did not detect anything unusual in his voice.

---

6.  The hospital discharge summary report of December 17, 1993, did not indicate that the decedent was experiencing an "altered mental status" or that he was not in good mental health.  This document was admitted into evidence as appellant's Exhibit C and Exhibit D.

7.  Blanche's daughter, Ellen, was previously married to the decedent.

Ellen, the decedent's fourth wife, testified that even though she had divorced the decedent, they remained very good friends. Ellen verified that appellee and the decedent knew each other extremely well and had a very tight bond.

While the decedent spoke of suicide if his illness "progress[ed] beyond a certain point in terms of deterioration," the decedent indicated on the "Thanatos Tape" that he would not "do this capriciously or foolishly. * * *" The decedent's thoughts concerning suicide were seemingly based on his observations of other people dying from chronic obstructionary pulmonary disease and the quality of care provided by hospitals.

In addition to having a close relationship with the decedent, appellee, *at the request of the decedent,* picked him up from the hospital on December 17, 1993, and, thereafter, provided care for him while he remained at his Virginia home for four months. At most, this demonstrates that appellee had an opportunity to exert undue influence upon the decedent. To the contrary, appellee presented evidence that showed that he and the decedent had a close relationship, and that appellee was not capable of manipulating or unduly influencing the decedent. For instance, Ellen testified that from her observations, she believed that appellee was not capable of unduly influencing the decedent because the decedent was a very independent person. In fact, Ellen admitted that she asked the decedent to leave an insurance policy to appellee because she "wanted to ensure somebody would have [her] son's interests at hand," claiming that appellee would give this money to her son at the appropriate time.

More important, there was no indication that appellee picked up the decedent from the hospital on December 17, 1993, with the intent of having him change the beneficiary of his life insurance policy. Rather, it was the *decedent who telephoned appellee* to pick him up from the hospital and *told appellee* that he wanted to get appellant "off of his major assets."[8]

Prior to picking up the decedent at the hospital, appellee, again *at the decedent's request,* obtained a State Teachers Retirement Systems ("STRS") benefits form for the decedent. When appellee arrived at *decedent's* hospital room, he immediately *asked* for the STRS form and began filling it out.[9] Appellee knew that the decedent was using this form to change the beneficiary of his retirement benefits from appellant to his son, Abdul Wallbrown, with his

8. The reason why the decedent wanted to go to appellee's home in Virginia was that he was afraid of contracting an infection from appellant as she may have had bronchitis. Furthermore, during this time, appellant was preparing for an examination to become a licensed psychologist, which was administered in April 1994.

9. This document was admitted into evidence as appellee's Exhibit A.

other son, Sheldon Wallbrown, as the contingent beneficiary. During this time, appellee indicated that the decedent's mental capacity was lucid.

Upon leaving the hospital, the nurses escorted the decedent to appellee's car. Thereafter, the *decedent asked appellee* to drive him to his house where he lived with appellant in order to retrieve some clothing for the trip to Virginia.

While at the decedent's house, appellee obtained clothing for the decedent because he was having much difficulty walking. During this time, the decedent had a conversation with appellant in the driveway while he remained in the vehicle. The decedent did not advise appellant that he was going to appellee's home in Virginia. Rather, he informed her that he was going to stay at a motel.

After leaving his home, the *decedent asked appellee* to drive to Ellen Reuter's home to pick up an insurance form. Reuter and the decedent had a professional relationship, and she also took over many of the decedent's courses when he was too ill to teach. At this time, appellee was unaware that the decedent was obtaining this insurance form in order to change the beneficiary. After obtaining the form from Reuter, the decedent filed it out and placed it in the glove compartment of appellee's vehicle. At no time did appellee direct or assist the decedent in filing out the change of beneficiary form.

When the form was completed, the decedent advised appellee that he was the named beneficiary of the life insurance policy. According to appellee, this was the first time he ever heard about the Kent State Medical Life Insurance Policy. Once they reached Virginia, the STRS and change of beneficiary forms were mailed by appellee *at the decedent's request.* Further, it was only after the decedent's death that appellee learned from his attorney the amount of the life insurance policy.

As mentioned earlier, the decedent made a tape recording known as the "Thanatos Tape." According to the decedent, the tape was made in order to "preserve a record of thoughts [and] memories." Upon listening to the tape, it is evident that the decedent expressed his thoughts in a clear and coherent manner, indicating his feelings towards appellee, appellant, and his sons, and dictating his wishes for distribution of property after his death. Specifically, the decedent spoke about his health, the STRS benefits, the life insurance proceeds, his concern and advice for his sons, and the treatment he received from appellant.

In his last entry on December 21, 1993, the decedent spoke about the behavior of appellant and stated the following:

" * * * I want to clearly document the fact of her [appellant's] failure to provide adequate care for me during my illness, at all times, on all accounts. * * * I want to clearly document the fact, that she under no circumstances provided adequate care or provided any good reason as to why she didn't provide

adequate care. In fact, she clearly refused to make arrangements for me to be returned back to our house * * *. Consequently, I called, my very close friend Dr. John Blaha, made arrangements for him to be available to pick me up at the time I was discharged from Cleveland Clinic. It was also evident to me that I was quite ill and not able in any way or prepared to be discharged from Cleveland Clinic. * * * Since I had been left for 3 days without being provided either food, or water, which is even more important, since I was taking an antibiotic. Had been left alone for this time period, without even any explanation other than pouting and getting angry * * *. I, want to be very clear about this, I want to be very clear about the fact, that I would have been abandoned and would have had to been taken to a nursing home or some kind of halfway house or hospice, had it not been for my friend John Blaha. It's very important to me, that in terms of consideration of my estate, that Dr. Blaha be adequately reimbursed for the time and the effort that he has invested in my care because without his care I would have been totally left in unbearable physical and mental state. In fact, I don't have the slightest idea of what would have happened to me. There were a few other people I could have stayed with for a short period of time, but those things simply can't go on forever, and in John's case, he will stick with me whatever time it takes. So it's very important that any litigation that comes down, that this matter be fully considered and that her [appellant's] treatment of me be clearly documented. This is a vicious manipulative woman, who has no interest in me other than attempting to gain control of my assets. * * * I have removed her and any interest she may have, in terms of my State Teachers Retirement benefits, life insurance policies, since she has not behaved like a wife and has done nothing other than try to gain, in the benefit, in the course of a short marriage. * * *. She is a vicious person, who can under no circumstances be believed or trusted. * * * "

Upon considering all the testimony and evidence, we conclude that appellee was able to rebut the presumption of undue influence by a preponderance of the evidence while appellant was unable to prove undue influence by clear and convincing evidence. The record fails to show any evidence that improper influence was actually exerted or attempted by appellee. No witnesses were presented to establish that appellee was unduly influencing the decedent or that the decedent was easily imposed upon.

Moreover, the passage of nearly a year and a half after the execution of the change-of-beneficiary form indicates that the decedent had a sufficient opportunity to change his mind with respect to his life insurance beneficiary. Thus, we hold the trial court properly determined that there was no evidence of undue influence.

Next, we consider appellant's assertion that the decedent lacked the capacity to change the beneficiary of his life insurance policy. "The proper test for mental competency * * * is whether the person claimed to be incompetent understood the nature of the transaction and the effects of his or her own actions." *Giurbino v. Giurbino* (1993), 89 Ohio App.3d 646, 658, 626 N.E.2d 1017, 1025–1026. The party making this claim, herein appellant, has the burden of proving incapacity by clear and convincing evidence. *Giurbino* at 658, 626 N.E.2d at 1025–1026; *McCluskey v. Burroughs* (1982), 4 Ohio App.3d 182, 4 OBR 284, 446 N.E.2d 1143.

In reviewing the record, we also conclude that appellant did not prove that the decedent lacked capacity by clear and convincing evidence. Witnesses who interacted with the decedent described him as being coherent and lucid. Further, there was testimony that the decedent always made his own decisions, had an independent mind, and a strong-willed personality. While the decedent had contemplated taking his own life, he stated on the "Thanatos Tape" that he would not take such action in a capricious or foolish manner. Rather, the notion of suicide was based on the decedent's observations of other people dying from chronic obstructionary pulmonary disease and the quality of care provided by hospitals.

In summation, the trial court did not err in granting appellee the life insurance proceeds, as there was no evidence of undue influence or lack of capacity. Appellant's first assignment of error is without merit.

Under the second assignment of error, appellant suggests that even if the trial court did not find undue influence or incapacity, the court should have allocated the life insurance proceeds between appellant and appellee as it was within the court's equitable power.[10]

As we noted in the first assignment of error, appellant offered no evidence of undue influence on behalf of appellee in obtaining the life insurance proceeds. Further, there is no evidence that the decedent lacked the capacity to change the beneficiary of his life insurance policy. Accordingly, the evidence before this court is insufficient to find that the principles of equity have been abused. This is especially true in light of the fact that on the "Thanatos Tapes," the decedent expressed his intention to remove appellant from the life insurance policy. Appellant's second assignment of error is not well taken.

---

10. During the bench trial, appellant testified that after the decedent's death on May 5, 1995, she expended money to satisfy certain outstanding financial matters, bills, and funeral expenses. In addition, it was only after her husband's death that appellant discovered that she was no longer the beneficiary of the life insurance policy and that appellee was the named beneficiary.

As a final note, we determine that this appeal is not frivolous, as it presented a reasonable question for review. Therefore, we deny appellee's App.R. 23 motion for attorney fees.

Based on the foregoing analysis, appellant's assignments of error are without merit, and the judgment of the trial court is hereby affirmed.

*Judgment affirmed.*

FORD, P.J., and NADER, J., concur.