HILDRETH MFG., L.L.C. et al., Appellees and Cross–Appellants,

v.

SEMCO, INC. et al., Appellants and Cross–Appellees.

Semco, Inc., Appellant and Cross–Appellee,

v.

Hildreth Mfg., L.L.C. et al., Appellees and Cross–Appellants.

[Cite as *Hildreth Mfg., L.L.C. v. Semco, Inc.,* 151 Ohio App.3d 693, 2003-Ohio-741.]

Court of Appeals of Ohio,
Third District, Marion County.

Nos. 9–01–57 and 9–01–61.

Decided Feb. 20, 2003.

694

Gary D. Greenwald and Donell R. Grubbs, for Hildreth Mfg., L.L.C. et al.

J.C. Ratliff and Christopher L. Lardiere, for Semco, Inc. et al.

SHAW, Judge.

{¶ 1} These consolidated cross-appeals arise from three judgments of the Common Pleas Court of Marion County, Ohio, entered on October 11, 2001. Two

of the judgments involved the trial court's decision to grant directed verdicts as to various claims made by the parties to this litigation, while the third judgment involved verdicts rendered by the jury.

{¶ 2} The relevant facts and procedural history of this case are as follows. In 1976, Leonard Furman and Ray Hildreth formed Semco, Inc. The primary business of the company was to manufacture and sell beryllium copper plunger tips, which were used in machines designed to create injection-molded aluminum parts. In order to further this purpose, Semco operated its own foundry to make these tips rather than contracting with an outside foundry. The two men continued to operate the business as the sole shareholders, each owning 50 percent of the company, well into the 1990s. Shortly after the company's inception, Terry Hildreth, Ray's son, began working for Semco. Through the years, Terry was promoted and in time became Semco's vice-president and plant manager. However, sometime in the mid to late 1990s, several disputes arose between Furman and Ray Hildreth, which culminated in the filing of various lawsuits, including an action filed by Ray to dissolve the corporation.

{¶ 3} The parties eventually reached an agreement as to all litigation matters on January 4, 1999. The terms of the agreement required Ray to sell his shares in Semco to Furman in exchange for a specified amount or for Furman to sell his shares to Terry if he could not obtain financing. The agreement also permitted either party to lawfully compete with the other after the sale of the shares, including soliciting Semco's customers, employees, vendors, and sales representatives. This agreement was signed by both Furman and Ray, as well as by Terry Hildreth and Furman's children. Furman and Ray Hildreth also signed this agreement on behalf of Semco, Inc.

{¶ 4} On February 1, 1999, Ray sold his shares in Semco to Leonard Furman. At some point during this time, Terry Hildreth left the employ of Semco and began his own company, Hildreth Mfg., L.L.C. Various employees, including coappellee/cross-apellant Gary Scott, also left Semco and went to work for Hildreth. Shortly thereafter, Furman came to believe that Scott had copied Semco's computer files by placing them on a magnetic tape and had brought the files with him to Hildreth in an effort to misappropriate Semco's trade secrets and private customer information. Semco summoned the police, who then spoke with Scott and Terry Hildreth about these allegations. In addition, Semco issued a memorandum informing its employees that it would exercise its legal rights to protect what it deemed confidential information and wrote letters to those employees who had gone to work for Hildreth, giving them the same information.

{¶ 5} Hildreth responded to the actions of Semco by instituting the present action, case No. 99–CV–182, on April 9, 1999. The complaint listed Hildreth, Mfg., L.L.C., and Terry Hildreth as plaintiffs, as well as those employees who

had left Semco to work for Hildreth. Count 1 of this complaint sought a declaratory judgment, asking the court to determine that Semco did not have any trade secrets or confidential information prior to February 1, 1999, that any such information was in the public domain, that Hildreth and the other plaintiffs had not misappropriated or improperly used any such information even if the court determined that Semco possessed trade secrets prior to February 1, 1999, and that Semco consented to the use of any such information when it executed the settlement agreement in the prior litigation between Furman, Semco, and Ray Hildreth. The second count of this complaint alleged that Semco breached this settlement agreement and interfered with Terry Hildreth and Hildreth Mfg., L.L.C.'s ability to lawfully conduct business.

{¶ 6} Semco and Leonard Furman instituted their own action against Hildreth, Mfg., L.L.C., Ray Hildreth, Terry Hildreth, and Gary Scott on April 20, 1999, case No. 99–CV–195. The complaint in this action alleged the following counts: Count 1—misappropriation of trade secrets by each defendant; Count 2—conversion by each defendant; Count 3—breach of fiduciary duty by Ray Hildreth, Terry Hildreth, and Gary Scott; Count 4—breach of contract by Ray Hildreth and Terry Hildreth; Count 5—unfair competition by each defendant; Count 6—unjust enrichment by each defendant; and Count 7—civil conspiracy by each defendant. This complaint requested compensatory and punitive damages, attorney fees, and both preliminary and permanent injunctions prohibiting the defendants from using Semco's trade secrets. Pursuant to Semco's request, the trial court issued a temporary restraining order prohibiting Hildreth and its employees from using any materials obtained from Semco. The restraining order also prohibited them from "destroying, concealing, or altering in any fashion any documents," including those contained on the hard drives of their computers.

{¶ 7} After filing its own suit, Semco then filed its answer to Hildreth's original complaint in case No. 99–CV–182 on May 14, 1999. Along with this answer, Semco filed a counterclaim, alleging the following counts: Counterclaim 1—misappropriation of trade secrets by each plaintiff; Counterclaim 2—conversion by each plaintiff; Counterclaim 3—breach of fiduciary duty by Terry Hildreth and Gary Scott; Counterclaim 4—breach of contract by Terry Hildreth; Counterclaim 5—unfair competition by each plaintiff; Counterclaim 6—unjust enrichment by each plaintiff; and Counterclaim 7—civil conspiracy by each plaintiff. Many of the allegations contained in this counterclaim mimicked the complaint filed by Semco on April 20, 1999.

{¶ 8} On May 26, 1999, Hildreth Mfg., Terry Hildreth, Ray Hildreth, and Gary Scott filed their answer to Semco's complaint in case No. 99–CV–195. In addition, they filed a counterclaim against Semco and Furman, alleging the following counts: Counterclaim 1—breach of contract and Counterclaim 2—fraud.

This counterclaim was subsequently amended with leave of court to include a third count for abuse of process.

{¶ 9} Shortly after filing its complaint, Semco filed a motion to disqualify Hildreth's counsel. The trial court overruled this motion, and discovery commenced. On February 4, 2000, Semco filed a motion for contempt and for sanctions against the Hildreth parties, alleging that they had willfully destroyed the hard drives of Hildreth Mfg.'s computers in direct violation of the temporary restraining order, which was still in effect. The trial court overruled this motion in its entirety on March 14, 2000. Thereafter, the proceeding was bifurcated as to the request for an injunction and the request for damages.

{¶ 10} A bench trial was held on May 10–12 and 15–16, 2000, on Semco's request for a permanent injunction to prohibit Hildreth and the former employees of Semco from using Semco's trade secrets. At the conclusion of this trial, wherein both sides presented testimonial and documentary evidence, the trial court denied the request for injunctive relief and granted the Hildreth parties' motion to dismiss, pursuant to Civ. R. 41(B)(2). On May 30, the trial court filed its decision in writing and ordered the parties to submit proposed findings of fact and conclusions of law. The trial court adopted in toto the proposed findings of fact and conclusions of law submitted by the Hildreth parties on July 13, 2000, in case No. 99–CV–195. Based upon this decision, the trial court also reached the same conclusion in case No. 99–CV–182 on September 11, 2000.

{¶ 11} Both cases were originally assigned to the Common Pleas Court judges of Marion County, Ohio. However, on November 27, 2000, Chief Justice Moyer of the Ohio Supreme Court assigned Judge Richard Parrot of Union County, Ohio, to preside over both cases. On December 4, 2000, the two cases were consolidated. Thereafter, Hildreth was permitted to amend its counterclaim to include a third count, alleging abuse of process against the Semco parties. On August 15, 2001, Semco filed a motion to dismiss this additional count. This motion was granted by the trial court, and the matter finally proceeded to a jury trial on the damages issue on September 24–27, 2001.

{¶ 12} The Hildreth parties were the first to present their claims to the jury. After the close of the Hildreth parties' case, the Semco parties made a motion for a directed verdict as to Hildreth's claims for breach of contract, business interference, and fraud. The trial court granted this motion. Hildreth then requested a directed verdict as to Semco's claims of misappropriation of trade secrets, based upon the evidence presented during the injunction portion of these cases. The trial court also granted this motion. Lastly, Hildreth requested a directed verdict as to Semco's claims of conversion. The trial court also granted this motion, based upon the evidence presented during the injunction portion of these two cases.

{¶ 13} The Semco parties then presented their case to the jury as to their claims of breach of contract, breach of fiduciary duty, unfair competition, unjust enrichment, and civil conspiracy. At the conclusion of Semco's presentation of evidence, the Hildreth parties made a motion for a directed verdict as to the five remaining claims in Semco's complaint in case No. 99–CV–195 and its counterclaim in case No. 99–CV–182. The trial court granted a directed verdict in favor of the Hildreth parties as to Semco's allegations of unfair competition, unjust enrichment, and civil conspiracy. Thus, the only claims presented for the jury's consideration were Semco's allegations of breach of fiduciary duty and breach of contract against the Hildreth parties.

{¶ 14} On September 27, 2001, the jury returned verdicts in favor of the Hildreth parties as to the remaining claims of breach of fiduciary duty and breach of contract. These appeals followed, and Semco now asserts six assignments of error. In addition, Hildreth now asserts three assignments of error. For ease of discussion, this court will first address Semco's assignments of error, some of which will be discussed out of turn for purposes of clarity.

### Semco's First Assignment of Error

{¶ 15} "The trial court erred and abused its discretion in denying Semco's Motion for Contempt against Hildreth for spoliation of evidence."

{¶ 16} Contempt of court has been defined by the Ohio Supreme Court "as disobedience of an order of a court. It is conduct which brings the administration of justice into disrespect, or which tends to embarrass, impede or obstruct a court in the performance of its functions." *Windham Bank v. Tomaszczyk* (1971), 27 Ohio St.2d 55, 271 N.E.2d 815, paragraph one of the syllabus; see, also, *State ex rel. Corn v. Russo* (2001), 90 Ohio St.3d 551, 554, 740 N.E.2d 265. In addition, "[t]he purpose of contempt proceedings is to secure the dignity of the courts and the uninterrupted and unimpeded administration of justice." *Tomaszczyk,* 27 Ohio St.2d 55, 271 N.E.2d 815, at paragraph two of the syllabus.

{¶ 17} Because the authority of the court is "the primary interest involved in a contempt proceeding * * *, great reliance should be placed upon the discretion of the trial judge." *Denovchek v. Trumbull Cty. Commrs.* (1988), 36 Ohio St.3d 14, 16, 520 N.E.2d 1362. Thus, a reviewing court "must apply an 'abuse of discretion' standard" when examining a finding of contempt. *Dozer v. Dozer* (1993), 88 Ohio App.3d 296, 302, 623 N.E.2d 1272. An "abuse of discretion * * * implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. In addition, the Supreme Court of Ohio has held that a trial court abuses its discretion when the result is "so palpably and grossly violative of fact

or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias." *Nakoff v. Fairview Gen. Hosp.* (1996), 75 Ohio St.3d 254, 256, 662 N.E.2d 1. Accordingly, a reviewing court is not permitted to substitute its judgment for that of the trial court. *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301.

{¶ 18} One day after Semco filed its complaint, a temporary restraining order was issued, which prohibited Hildreth from "destroying, concealing, or altering in any fashion any documents," including those contained on the hard drives of its computers. Throughout this litigation, Semco has alleged that prior to leaving Semco's employ for that of Hildreth's, Gary Scott took a magnetic tape containing all materials stored on his computer at Semco, including customer information and product data, without permission and then used it for the benefit of Hildreth. In an effort to prove this allegation, Semco requested access to Hildreth's computers to copy their images in order to determine whether the information allegedly taken from Semco was subsequently placed on Hildreth's hard drives. Semco's request included imaging Hildreth's Mazak computer hard drives, which were purchased after the temporary protection order was issued in order to operate lathe equipment.[1]

{¶ 19} Although Hildreth permitted Semco to image its desktop computers, it expressed concern that imaging the Mazak drives could damage them and possibly lead to employee injuries if the lathe equipment malfunctioned. This concern was brought to the attention of the trial court. Prior to resolving this issue, a representative from Mitsubishi, the Mazak supplier, removed the Mazak hard drives and replaced them with different ones without any protest by Hildreth. However, unbeknownst to Hildreth, Mitsubishi then took the Mazak drives, erased them, and redistributed them to other customers.

{¶ 20} After learning of the erasure of the Mazak drives, Semco filed a motion for contempt for spoliation of evidence. In its motion, Semco requested that the court find Hildreth in contempt, grant a default judgment in Semco's favor, and award Semco attorney fees. In support of its position, Semco filed the deposition of Gary Scott and Donell Grubbs. Hildreth filed a response to this motion, denying any intentional wrongdoing. Thereafter, the trial court found that Hildreth had failed to properly preserve the requested evidence but that there was not a reasonable possibility that the missing hard drives contained evidence that would have been favorable to Semco's claims as required. See *Bright v. Ford Motor Co.* (1990), 63 Ohio App.3d 256, 578 N.E.2d 547. Therefore,

---

1. Lathe equipment is used to spin and shape hard materials by a fixed cutting or abrading tool.

the motion for contempt was overruled. In making this determination, the trial court reasoned that it was nonsensical to believe that Hildreth would place purloined computer information on its Mazak computers, which were obtained after the issuance of the temporary restraining order, knowing that Semco sought to image those computer hard drives.

{¶ 21} Semco contends that the trial court failed to accurately apply the holding in *Bright*. *Bright* involved a factual scenario relatively similar to the case sub judice. In *Bright*, the trial court issued an order requiring that certain evidence be maintained in its current condition. Id., 63 Ohio App.3d at 258, 578 N.E.2d 547. However, the plaintiff, the party in possession of the protected evidence, willfully violated the protective order by significantly altering the evidence prior to giving it to the defendants for inspection, thereby destroying potentially pertinent evidence. Based upon these facts, the trial court in *Bright* refused to allow the plaintiff's experts to testify regarding this evidence, which had the practical effect of eviscerating the plaintiff's case. Id. at 259, 578 N.E.2d 547. In reversing the decision of the trial court, the Second District Court of Appeals held that "a sanction which in effect puts a party out of court must be based on demonstrable prejudice to the opposing party." Id. That court further found that "a workable formulation of prejudice for purposes of this case is: a reasonable possibility, based on concrete evidence, that access to the unaltered [requested evidence] would have produced evidence favorable to [the defendants], which was not otherwise obtainable." Id. In remanding the case, the court determined that the "defendants should enjoy a presumption that they were prejudiced" and that the plaintiffs bore the burden of persuading the trial court that they were not. Id. at 260, 578 N.E.2d 547.

{¶ 22} Here, Semco maintains that the actions of Hildreth in permitting the Mazak drives to be removed and subsequently destroyed were egregious and highly prejudicial to its case. Thus, Semco argues that the trial court was required to enter a partial default judgment in favor of Semco as to the claims regarding the alleged theft of the magnetic tape by Gary Scott, pursuant to Civ. R. 37(B)(2). In addition, Semco contends that the trial court was also required to award Semco its reasonable expenses, including attorney fees, caused by the failure in accordance with Civ. R. 37(B)(2)(e).

{¶ 23} The Rules of Civil Procedure provide, "If any party * * * fails to obey an order to provide or permit discovery, * * * the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following: * * * An order * * * rendering a judgment by default against the disobedient party." Civ. R. 37(B)(2)(c). Thus, a court is granted discretion, as denoted by the use of the word "may" in its choice of sanctions, if any. In addition, a trial court is required to award reasonable expenses,

including attorney fees, caused by a party's failure to obey an order to provide or permit discovery, "unless the court expressly finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." Civ. R. 37(B)(2)(e).

{¶ 24} In this case, the court noted that there was no question that the defendants failed to properly preserve evidence. However, the court further found that there was no reasonable possibility that the missing hard drives contained evidence of the theft of trade secrets. The court's rationale for this finding was based upon the fact that Hildreth's Mazak computers were obtained after the protective order was issued with Hildreth fully aware that these computers were subject to discovery. Thus, the court reasoned that in order for it to determine that there existed a *reasonable* possibility that the Mazak drives contained evidence favorable to Semco, it would have to believe that Hildreth downloaded information from a stolen backup tape on to these computers all the while knowing that Semco wanted to image the hard drives. Because the court believed such a course of action to be extremely foolish, it determined that no such evidence existed on the Mazak drives.

{¶ 25} We do not find that the court's decision evidences perversity of will, defiance of judgment, or the exercise of passion or bias or that its attitude was unreasonable, arbitrary, or unconscionable. Rather, we find the court's rationale to be well reasoned based upon the evidence presented to it, as well as the logical exercise of judgment. In addition, although Semco may have enjoyed a presumption that it was prejudiced by the destruction of the hard drives, the court was well within its discretion to determine that Hildreth adequately rebutted that presumption by showing that a reasonable possibility did not exist that access to the requested evidence would have produced evidence favorable to Semco that was otherwise unattainable. Thus, we do not find that the trial court abused its discretion in overruling Semco's motion for contempt. In addition, we do not find that the trial court was required to award Semco its reasonable expenses, given its finding that there was no reasonable possibility that the Mazak hard drives contained information favorable to Semco. Therefore, Semco's first assignment of error is overruled.

## Semco's Fourth Assignment of Error

{¶ 26} "The trial court erred and abused its discretion in denying Semco injunctive relief."

{¶ 27} In its complaint, Semco alleged that it had trade secrets that were misappropriated by the Hildreth parties. Therefore, Semco requested in its prayer for relief that the Hildreth parties be enjoined from using what it alleged were its trade secrets and pay damages for this misappropriation. As previously

noted, the trial court bifurcated the proceedings, with the consent of all the parties, into the injunction portion and the damages portion. A five-day bench trial was then held on the injunction portion of this litigation. After Semco presented its evidence, Hildreth requested that the injunction request be denied. The trial court granted this motion pursuant to Civ. R. 41(B)(2) and later adopted the proposed findings of fact and conclusions of law filed by Hildreth in toto on July 13, 2000. Semco now contends that the trial court erred in denying its request for an injunction.

{¶ 28} Our analysis of this assignment of error begins by noting that "a dismissal of plaintiff's case under Civ. R. 41(B)(2) allows the trial court to weigh the evidence, resolve any conflicts therein, and render judgment for the defendant if the plaintiff has shown no right to relief." *Bank One, Dayton, N.A. v. Doughman* (1988), 59 Ohio App.3d 60, 63, 571 N.E.2d 442. Further, "[t]he dismissal will be set aside only if erroneous as a matter of law or against the manifest weight of the evidence." Id.

{¶ 29} The Revised Code provides that "[a]ctual or threatened misappropriation may be enjoined." R.C. 1333.62(A). However, the injunction must be terminated once "the trade secret has ceased to exist." Id. The code further defines what constitutes a trade secret: " 'Trade secret' means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses or telephone numbers, that satisfies both of the following: (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." R.C. 1333.61(D).

{¶ 30} Although the Revised Code provides a definition of a trade secret, whether certain information constitutes a trade secret is not always easily determinable. The Revised Code mandates that a trade secret cannot be acknowledged as such unless the manufacturer has initiated measures designed to ensure the security of those things considered trade secrets. Moreover, "[u]nderlying almost every case in which a former employee is accused of the unauthorized disclosure or use of trade secrets is the matter of balancing or reconciling ' * * * the conflicting rights of an employer to enjoy the use of secret processes and devices which were developed through his own initiative and investment and the right of employees to earn a livelihood by utilizing their personal skill, knowledge and experience.' " *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.* (1986), 24 Ohio St.3d 41, 46, 24 OBR 83, 492 N.E.2d 814,

quoting *GTI Corp. v. Calhoon* (S.D.Ohio 1969), 309 F.Supp. 762, 768. Further, "[a] balancing of these two interests may be facilitated by distinguishing between knowledge and skill that is general in the trade as a whole and 'secret' knowledge which is acquired particularly and specifically from the employer." Id.

{¶ 31} Semco maintains that its specifications for its nonstandard alloy charge used in creating the metal for its beryllium copper plunger tips, its library of pattern, casting, and finished drawings for the tips, its specifications for the annealing and heat-treating of the tips, the database of information used in machining the tips, and various other choices involved in its manufacturing process, as well as its customer information, are all protected trade secrets. Although Semco maintains that it met its burden of proof during the injunction hearing, it has repeatedly failed to provide citations to the record in support of its argument.

{¶ 32} App.R. 16(A)(7) requires an appellant's brief to include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the * * * parts of the record on which appellant relies." In addition, this court's local rules provide that "[a]ll references to the record must include references to the volume and page numbers." Loc.R. 7(C). The purpose of these rules is to aid the reviewing court in determining whether any reversible error occurred in the lower court by having the complaining party specify the exact locations where such a determination can be made. This is especially important in complex cases, cases with several volumes of transcript as this case has, and cases that involve areas of knowledge that are often unfamiliar to members of the judiciary, such as the process used in making beryllium copper plunger tips. Thus, we strongly suggest that these rules be heeded in the future. However, despite Semco's failure in this respect, we note that Semco somewhat corrected this error in its reply brief to this court by providing some limited citations to the record. Thus, we proceed to decide the merits of this assignment of error, having reviewed the record in its entirety.

{¶ 33} During the injunction hearing, Semco presented several witnesses, including an expert, all of whom testified about Semco's method of manufacturing beryllium copper plunger tips. Some of these witnesses also testified about Semco's customer information. In addition, Semco called Ray Hildreth and Gary Scott, as on cross-examination, to testify about both Semco's and Hildreth's manufacturing processes. Semco's expert also provided testimony comparing the processes of the two companies. Further, witnesses for Semco testified about the steps taken to protect and safeguard what Semco considered its trade secrets.

{¶ 34} The evidence presented by Semco revealed the following. The product manufactured and sold by both companies, beryllium copper plunger tips, is used for machines designed to create injection-molded aluminum parts. Because of the high temperatures under which these tips must perform, they must be designed and manufactured to both withstand extreme heat and function for an extended period of time. Therefore, the metal composition of the tips is critical, as is the overall process by which the tips are made. In addition, the tips are cylindrical and are designed with a cooling chamber in the center. Throughout the years, Semco has had competitors in this business, but most of their competitors do not operate their own foundries as does Semco. In addition, witnesses for Semco testified that Semco has a very large share of the plunger-tip market.

{¶ 35} Semco went to great length in describing the process that it uses for manufacturing its plunger tips. However, the evidence revealed that nearly every step involved in the making of these tips was available in some form through commercial literature. In addition, Semco was aided in various process decisions by its vendors. These vendors were under no obligation to provide information solely to Semco but, rather, provided similar aid to their other customers. There was also evidence that Semco, itself, disseminated information pertaining to its tip-making process. Moreover, Semco's president testified that the external and internal dimensions of the tips could be ascertained through reverse engineering. Furthermore, Ray Hildreth's unrefuted testimony revealed that he gained the knowledge and skill of how to make plunger tips by working in the business before he formed Semco with Leonard Furman. Accordingly, this know-how was what prompted him to form Semco. Thus, he did not *acquire* his knowledge particularly and specifically from Semco, but, rather, he *imparted* his knowledge to Semco.

{¶ 36} Despite this evidence, Semco maintains that many steps in its process are trade secrets belonging to Semco because it "tweaks" those steps in order to produce a superior product. However, Semco failed to introduce any evidence that this tweaking was not information readily ascertainable by those in the plunger-tip business. In addition, Semco failed to present evidence that Hildreth misappropriated this information and used it for its own purposes or was likely to do so in the future. Although Semco's expert testified that many steps Hildreth used were similar or identical to Semco's, he also admitted that in some instances, this was common given the nature of the business and that the two businesses also had various differences in their processes.

{¶ 37} The evidence also revealed that customers sent drawings to Semco, which would reflect the dimensions of the tips that they were ordering from Semco. Often these drawings sent by customers would originate with

competitors of Semco. Although Semco usually kept these drawings, the customer was not required to keep the contents of the drawing confidential. In addition, some of the drawings given to Semco by its customers contained information that the drawing was the proprietary information of the *customer*. Semco also sent casting drawings to pattern makers in order for them to make patterns for the molten metal to be cast as part of the process of making. the tips. These drawings were also available to Semco's customers upon request. Semco presented no evidence that the pattern makers were under an obligation to keep these drawings confidential or that Hildreth had any of these drawings in its possession or the possession of its employees or officers.

{¶ 38} Semco also contends that Hildreth, through Gary Scott, copied its machining database from Scott's computer at Semco prior to Scott's resigning from the company. This database contained numerous programs pertaining to the machining of plunger tips to produce the final product to a customer's specifications, which Semco maintains is its trade secret. In support of this contention, Semco produced evidence that Scott hired a computer consultant on behalf of Semco to create a backup tape of his computer hard drive, which contained the machining information. The testimony revealed that the consultant made a backup on one tape, demonstrated how to perform the operation to Scott, and then left the backup tape and an additional tape with Scott. Scott's replacement at Semco testified that he found only one tape after Scott left. In addition, Semco produced a computer printout allegedly from Scott's computer at Semco in an attempt to show that an additional backup was made. However, no evidence was presented that Scott made another backup or removed anything from Semco that did not belong to him. The evidence also revealed that Scott's computer did not require a password and that others had access to this computer while he was employed at Semco and thereafter. In short, the only evidence supporting Semco's claim that Scott misappropriated the information on his Semco computer is that the consultant brought an additional tape, which was never found, and a printout that was inconclusive at best as to whether Scott made an additional backup tape. Moreover, the evidence revealed that each program was entered into the computer pursuant to the specific order of a customer once the customer placed its order so that each was readily ascertainable from the individual customer order and not proprietary to Semco.

{¶ 39} Semco also asserts that its customer list is a trade secret. The evidence revealed that nearly all of Semco's customers were members of the North American Die Casting Association ("NADCA"), which publishes a list of its members that includes the member's name, address, telephone number, fax, e-mail, and the name of an officer or employee of the member company. However, Semco's president testified that NADCA's list did not necessarily provide the

name of the person to contact in an effort to sell plunger tips, which is information that Semco acquired over the years. Nevertheless, a person could readily ascertain a vast majority of Semco's customer list from NADCA's publication and could contact those customers in an effort to solicit their business. If those customers then chose to do business with Semco's competitor, they would then provide their tip specifications to that competitor. In essence, all vendor and customer information of Semco's was available in the public domain, and no evidence was presented that others in the plunger-tip business did not have access to this information. Thus, this information was not Semco's trade secret.

{¶ 40}  Furthermore, the evidence did not reveal that anyone at Hildreth took Semco's customer information with him after leaving Semco's employ. Although there was testimony that Terry Hildreth had a meeting with some Semco employees and provided a list of items that he would need to start a new company, which included customer cards, this list was not specific to Semco but, rather, contained items generally needed for the start-up of a plunger-tip business. This testimony also revealed that he told some of Semco's office staff to copy anything that they would find helpful if they decided to leave Semco and work for him. However, further evidence revealed that "anything" meant a copy of a form, such as a blank invoice, for an example of what the new company would need. No evidence presented by Semco indicated that anyone was told to copy the customer or vendor lists for the Hildreth parties or indicated in any way that any forms solicited by Terry Hildreth were not readily ascertainable by going to an office supply store.

{¶ 41}  After reviewing all the evidence presented by Semco regarding what it considered to be its trade secrets, we find that only a few of its methods were not generally known or readily ascertainable by proper means. However, what little was not readily ascertainable was not subject to reasonable efforts to maintain its secrecy under the circumstances of this case. Semco contends that it used reasonable efforts to maintain the secrecy of what it alleges are its trade secrets. In support of this assertion, Semco maintains that it took steps similar to those in *Valco,* supra. In *Valco,* the trade-secret holder had locking devices on its plant, and a receptionist screened every visitor to the building and operated a buzzer lock system on the door to the processing area. *Valco,* 24 Ohio St.3d at 47, 24 OBR 83, 492 N.E.2d 814. In addition, the general public was never taken through the plant, and competitors were never authorized within the plant. Valco's drawings were made available to suppliers only for limited purposes, only certain employees had access to the drawings, each drawing that left the plant was required to have a proprietary marking restricting its use and disclosure, and a shredder was used to destroy all computer printouts and old pricing sheets. Also, nondisclosure agreements were required of key employees with limited exceptions. Id.

{¶ 42} To the contrary, Semco only presented evidence that its building was locked when closed, a receptionist was seated in the front office, and the front door was equipped with a buzzer to alert office personnel that someone had entered the building, but the buzzer often malfunctioned. Although some testimony was given by witnesses that they kept Semco's information confidential and that some office personnel shredded various Semco documents, no employees or officers were required to sign nondisclosure agreements, and no one was ever specifically instructed to shred certain documents. Additionally, no documents were marked "confidential" even when they left Semco's facility, with the limited exception of Semco's fax cover sheet, beginning in 1996 or 1997. These documents included drawings and invoices. Semco also permitted employee family members into its facility and allowed the general public into the building on tours. Further, at least one of Semco's competitors was allowed into the foundry.

{¶ 43} Finally, and most important, the language of the addendum to the settlement agreement clearly evidences an intent on the part of the parties to compete against one another. In fact, neither party disputes that Ray Hildreth sold his shares to Furman, intending to continue making beryllium copper plunger tips. Nevertheless, Semco maintains that the agreement provided that the parties could "lawfully" compete with one another and that misappropriating trade secrets is unlawful competition. However, armed with the knowledge that Ray Hildreth, a man who had years of experience in this kind of business, would most likely be leaving the company with his son and that the two intended to compete with it, Semco was obligated to take reasonable measures to ensure that the secrecy of any information it deemed trade secrets was maintained. Yet the settlement agreement is entirely void of any clause regarding the confidentiality of information belonging to Semco. It states neither that Semco regarded certain information as a trade secret nor that the Hildreths were prohibited from using such information. This court fails to recognize how Semco can claim that it took reasonable measures under the circumstances to ensure the secrecy of its information when it neglected to take such an elementary protective measure. Thus, we hold that this failure by Semco was wholly unreasonable as a matter of law. Hence, Semco did not satisfy the second requirement of R.C. 1333.61(D), that it take reasonable measures under the circumstances to maintain the secrecy of what it considered trade secrets. Accordingly, the evidence demonstrates that Semco possessed no trade secrets as a matter of law under these circumstances. Therefore, Semco's fourth assignment of error is overruled.

## Semco's Second Assignment of Error

{¶ 44} "The trial court erred as a matter of law when it granted Hildreth's motion for directed verdicts on the basis of a former judge's finding of facts and

conclusions of law dismissing Semco's application for injunctive relief because the dismissal of an application for injunctive relief does not preclude an action for monetary damages."

{¶ 45} As previously noted, Hildreth made a motion to the trial court for a directed verdict during the damages portion of the litigation as to the counts pertaining to the alleged trade secrets of Semco. After inquiring of Semco as to whether it intended to present any additional or different information from that presented during the five-day injunction hearing and learning that it did not intend to present any other evidence, Judge Parrot granted Hildreth's motions for directed verdicts. In so holding, Judge Parrot stated that he was bound by the previous trial judge's decision in the injunction phase of this litigation. However, Semco maintains that the trial court erred in granting these directed verdicts based upon the findings of fact and conclusions of law from the injunction hearing, which were made by Judge Davidson.

{¶ 46} " 'The test for a motion for a directed verdict under Civ.R. 50 is whether after construing the evidence most strongly in favor of the party against whom the motion is made, the court finds that upon any determinative issue, reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party. In such event, the court is not the trier of the facts and does not weigh the evidence in ruling on the motion.' " *Bank One, Dayton, N.A. v. Doughman* (1988), 59 Ohio App.3d at 62, 571 N.E.2d 442, fn. 4, quoting *Jones v. Dolle* (Aug. 2, 1978), Hamilton App. No. C–77357, at 2–3. However, Civ. R. 50 applies to a jury trial. In cases tried to the bench, the trial court is permitted to weigh the evidence and rule thereon. *Wallbrown v. Kent State Univ.* (2001), 143 Ohio App.3d 762, 767, 758 N.E.2d 1213.

{¶ 47} This case presents an unusual circumstance in that the evidence presented at the injunction hearing was to the bench, while a jury trial was had for the damages portion. However, the motion for a directed verdict was made and granted before the jury heard Semco's evidence on these claims. In either circumstance, the findings of fact made by Judge Davidson should have been irrelevant to Judge Parrot's determination of whether verdicts in favor of the Hildreth parties were appropriate, given the aforementioned standards. However, because these motions were made during the jury trial portion of the litigation, a Civ.R. 50 motion was proper. Thus, the evidence presented during the injunction hearing, which was the only evidence intended to be presented by Semco on the counts involving its alleged trade secrets, was to be construed in the light most favorable to Semco. After construing the facts in a light most favorable to Semco, the trial court then had to determine whether reasonable minds could come to but one conclusion upon the evidence submitted and that that conclusion was adverse to Semco.

{¶ 48} In this court's discussion of Semco's fourth assignment of error, we determined that the trial court did not err in denying Semco's request for injunctive relief. This court came to that determination by finding that the evidence presented by Semco did not establish that it had trade secrets as defined by statute. This is true even when construing the evidence in a light most favorable to Semco. Thus, although Judge Parrot stated that he was bound by the findings of fact and conclusions of law made by the previous trial judge, he did not err in granting Hildreth's motions for directed verdicts because the evidence presented by Semco during the injunction hearing did not establish, as a matter of law, that Semco possessed trade secrets as defined by statute. Therefore, Semco's second assignment of error is overruled.

## Semco's Third Assignment of Error

{¶ 49} "The trial court erred as a matter of law when it failed to exercise its discretion as required by Rule 63(B) of the Ohio Rules of Civil Procedure."

{¶ 50} Semco maintains in its third assignment of error that the trial court erred in granting Hildreth's motion for directed verdicts on the issue of damages by determining that it was bound by the previous judge's finding of fact and conclusions of law regarding the injunctive relief proceedings. Rather, Semco contends that the second judge was not bound by the previous findings and that by basing its ruling on the damages issue without exercising the discretion afforded a successor judge pursuant to Civ.R. 63(B), the trial court committed prejudicial error. Given this court's discussion as to Semco's second and fourth assignments of error, the trial court had no discretion to exercise, because Semco failed to demonstrate, as a matter of law, that it possessed trade secrets. Accordingly, Semco's third assignment of error is, likewise, overruled.

## Semco's Fifth Assignment of Error

{¶ 51} "The trial court erred as a matter of law and abused its discretion in denying Semco the right to a trial by jury on the first count of Hildreth's Complaint seeking declaratory judgment on issues of fact when a jury demand was made and neither party subsequently waived their right to a jury."

{¶ 52} Semco contends in its fifth assignment of error that the trial court erred in deciding the declaratory judgment action of Hildreth's complaint rather than submitting it to the jury when a jury demand was made and neither party waived this request. The Rules of Civil Procedure provide, "Any party may demand a trial by jury on any issue triable of right by a jury * * *." Civ. R. 38(B). Once properly demanded, a jury trial is required unless the parties later stipulate to a trial by the court or the court determines that the right to a jury trial as to some or all of the issues does not exist. Civ.R. 38(A). The Revised

Code provides, "Issues of law must be tried by the court, unless referred as provided in the Rules of Civil Procedure. Issues of fact arising in actions for the recovery of money only, or specific real or personal property, shall be tried by a jury, unless a jury trial is waived, or unless all parties consent to a reference under the Rules of Civil Procedure." R.C. 2311.04. Furthermore, "[a]ll other issues of fact shall be tried by the court, subject to its power to order any issue to be tried by a jury, or referred." Id.

{¶ 53} In the case sub judice, a jury demand was made. Although some of the claims were submitted to the jury, the declaratory judgment action instituted by the Hildreth parties was decided by the trial court rather than by the jury. Semco maintains that the trial court erred in choosing this course of action because the pleadings of Hildreth indicate that it was requesting money damages on its claim for declaratory judgment. We disagree.

{¶ 54} A review of the pleadings reveals that Hildreth sought money damages for its claims of breach of contract, business interference, fraud, and abuse of process. Hildreth did not request money damages for its declaratory judgment claim. Hence, a right to trial by jury on the declaratory judgment did not exist pursuant to R.C. 2311.04. Therefore, the trial court's decision to determine the declaratory judgment portion of this case was not error, as no right to a jury trial existed on this issue.

{¶ 55} Moreover, the Semco parties did not object to the jury instructions or verdict forms, which did not include the declaratory judgment claim, during the trial. The Supreme Court has previously held that "an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *State v. Glaros* (1960), 170 Ohio St. 471, 11 O.O.2d 215, 166 N.E.2d 379, paragraph one of the syllabus. Exceptions to this rule "are granted only in circumstances where the error has seriously affected the basic fairness, integrity, or public reputation of the judicial process." *Yungwirth v. McAvoy* (1972), 32 Ohio St.2d 285, 288, 61 O.O.2d 504, 291 N.E.2d 739. Given our discussion as to R.C. 2311.04, we find no circumstances warranting an exception to this rule. Therefore, not only is this assignment of error without merit, it is also not properly before this court. Thus, Semco's fifth assignment of error is overruled.

### Semco's Sixth Assignment of Error

{¶ 56} "The trial court erred in refusing to apply the doctrine of judicial estoppel to prevent the Hildreth parties from asserting a position

contrary to its position taken in earlier litigation involving the same or similar issues."

{¶ 57}  Prior to the current litigation, Semco instituted an action against Amcast, Inc., in federal court for violations of the Lanham Act. At the time, Ray and Terry Hildreth were officers of Semco.  During the pendency of that action, Amcast sought discovery from Semco, which included Semco customer information.  Semco objected to Amcast's discovery request, asserting that the requested information constituted confidential trade secrets.  Semco's written objection included an attached affidavit by Terry Hildreth that the information sought involved trade secrets.  Eventually, Semco and Amcast agreed to a stipulated protection order as a means to resolve the discovery dispute between them.  The trial court then accepted the stipulated protective order of the parties.

{¶ 58}  Based upon the actions of Ray and Terry Hildreth as officers of Semco during the Amcast litigation, Semco filed a motion in limine in the current action, requesting that the trial court apply the doctrine of judicial estoppel.  Semco asked the court to judicially estop the Hildreth parties from asserting the position that Semco did not have any protected trade secrets to misappropriate because Ray and Terry Hildreth had maintained a contrary position during the Amcast litigation by objecting to the discovery requests of Amcast for information that they considered confidential trade secrets.  The trial court overruled this motion, and Semco now asserts that the trial court erred in doing so.

{¶ 59}  " 'The doctrine of judicial estoppel "forbids a party 'from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding.' " ' "  *Smith v. Dillard Dept. Stores, Inc.* (2000), 139 Ohio App.3d 525, 533, 744 N.E.2d 1198, quoting *Teledyne Indus., Inc. v. NLRB* (C.A.6, 1990), 911 F.2d 1214, 1217.  In addition, judicial estoppel "preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment."  *Teledyne,* 911 F.2d at 1218.  Judicial estoppel applies " 'only when a party shows that his opponent: (1) took a contrary position; (2) under oath in a prior proceeding; and (3) the prior position was accepted by the court.' "  *Smith,* 139 Ohio App.3d at 533, 744 N.E.2d 1198, quoting *Griffith v. Wal–Mart Stores, Inc.* (C.A.6, 1998), 135 F.3d 376, 380.  The third element, judicial acceptance, "means only that the first court has adopted the position urged by the party, either as a preliminary matter or as part of a final disposition."  *Edwards v. Aetna Life Ins. Co.* (C.A.6, 1982), 690 F.2d 595, 599, fn. 5. "Requiring prior judicial acceptance protects the truth-seeking function of the court, while preserving the court's integrity."  *Teledyne,* 911 F.2d at 1218.

{¶ 60} In *Teledyne*, the Sixth Circuit Court of Appeals had to determine whether a court's acceptance of agreed orders constituted judicial acceptance of the parties' position. That court found that the prior position of one party's opponent was not accepted by the court because the agreed orders in the earlier proceeding contained no findings against another party and "because the district court's entry of the agreed orders did not constitute acceptance of them for purposes of judicial estoppel." Id. at 1219. The case at bar is similar to that of *Teledyne* in that Semco asserts that Ray and Terry Hildreth's contrary position in a prior case, while both were officers of Semco, was judicially accepted when the court in the previous litigation accepted a *stipulated* protective order agreed upon by the parties to that suit. Like *Teledyne*, the prior court in the Amcast litigation merely accepted a stipulation by the parties before it. The Amcast protective order contained no findings in favor of Semco, nor does the acceptance of the stipulated protective order constitute an acceptance of Semco's position in that litigation. Thus, there was no judicial acceptance of a contrary position taken by the Hildreth parties in a prior proceeding, and the doctrine of judicial estoppel was not applicable.

{¶ 61} Furthermore, this litigation involves unique circumstances. Unlike the Amcast litigation, the present parties had a settlement agreement, which did not specify that Semco possessed trade secrets that were not to be used by the Hildreth parties, and the Hildreth parties were critical in developing Semco's manufacturing process and customer base. Thus, the element that reasonable efforts under the circumstances be taken in order to constitute a trade secret is significantly different in the current litigation than it was in the Amcast suit. Therefore, the trial court did not err in denying Semco's request to apply the doctrine of judicial estoppel, and Semco's sixth assignment of error is overruled.

### Hildreth's First Assignment of Error

{¶ 62} "The trial court erred as a matter of law when it granted Semco's Motion for Directed Verdict upon the Hildreth parties' claim for fraud, set forth in Count Two of the Amended Counterclaim in Case No. 99–CV–0195."

{¶ 63} As previously discussed, " '[t]he test for a motion for a directed verdict under Civ.R. 50 is whether after construing the evidence most strongly in favor of the party against whom the motion is made, the court finds that upon any determinative issue, reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party. In such event, the court is not the trier of the facts and does not weigh the evidence in ruling on the motion.' " *Bank One, Dayton, N.A. v. Doughman* (1988), 59 Ohio App.3d at 63, 571 N.E.2d 442, fn. 4, quoting *Jones v. Dolle* (Aug. 2, 1978), Hamilton App.

No. C–77357. Because the granting of a directed verdict is a question of law, we review the trial court's decision to do so de novo.

{¶ 64} The elements of fraud are (a) a representation of fact (b) that is material, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance. *Cohen v. Lamko, Inc.* (1984), 10 Ohio St.3d 167, 10 OBR 500, 462 N.E.2d 407. Here, the Hildreth parties maintain that Leonard Furman committed fraud by entering the settlement agreement in the prior litigation, which did not contain a noncompetition clause or a confidentiality clause, and then filing suit against the Hildreth parties for misappropriation of trade secrets. Thus, the Hildreth parties maintain that they detrimentally relied upon the agreements made between them and Leonard Furman during the settlement of the previous litigation.

{¶ 65} Ray Hildreth testified that Furman attempted to settle the prior litigation by offering to purchase Ray's shares but that this offer required him to sign a noncompetition agreement, which contained a confidentiality clause. Therefore, Ray refused to accept the offer because he and his son "were going to make plunger tips." Thus, when the parties finally agreed to the actual terms of the settlement, the agreement did not contain either a noncompetition clause or a confidentiality clause. Although the agreement did not contain those clauses or otherwise provide for the protection of any possible trade secrets, the Semco parties filed suit alleging the misappropriation of trade secrets soon after Ray Hildreth sold his shares in Semco to Furman. However, the Hildreth parties failed to present any evidence, other than their subjective understanding of the meaning of the agreement, that Furman had made any false representation to them that was material to the transaction. No witness testified that Furman ever informed the Hildreth parties that he did not believe that Semco possessed trade secrets, nor did the settlement agreement refer to trade secrets. Although the Hildreths may have thought that Furman was agreeing that Semco possessed no trade secrets, no such representation was made. In fact, Ray Hildreth testified that he did not know of any specific representations of Furman that he relied upon in entering into the agreement.

{¶ 66} The Hildreths maintain that the fact that Furman attempted to obtain a noncompetition agreement with a confidentiality clause, was rejected, and then entered into the settlement agreement without a confidentiality clause and with specific permission for the parties to directly compete constituted a material omission on Furman's part, which amounts to fraud. However, the Hildreth parties failed to demonstrate detrimental reliance. The only evidence presented

in the way of detrimental reliance was Ray's testimony that it would have cost Furman $2,000,000 to $3,000,000 more if he had known that Furman would file suit upon his forming a competitive company. However, this testimony was based upon whether the Hildreths could compete with Semco rather than whether Furman considered certain items trade secrets of Semco. In addition, Ray did not testify that he relied on any omissions concerning what Semco considered trade secrets but instead testified that he relied on the fact that he and his son could compete with Semco. The evidence established not that Furman was suing the Hildreths for competing with him but that he filed suit because of an alleged misappropriation of trade secrets. Moreover, once again, Ray specifically stated that he could not remember what representations were made by Furman that he relied upon in making his decision to settle. Thus, even when construing the facts in a light most favorable to the Hildreth parties, they failed to provide evidence of fraud or detrimental reliance. Accordingly, Hildreth's first assignment of error is overruled.

## Hildreth's Second Assignment of Error

{¶ 67} "The trial court erred as a matter of law in excluding evidence relating to the damages incurred by the Hildreth Parties."

{¶ 68} In Hildreth's second assignment of error, it maintains that the trial court erred in excluding certain evidence of its damages relating to its cause of action for fraud. Since this court has previously determined in Hildreth's first assignment of error that the Hildreth parties failed to demonstrate that Furman misrepresented a material fact and failed to demonstrate any detrimental reliance thereon, Hildreth's second assignment of error is moot.

## Hildreth's Third Assignment of Error

{¶ 69} "The trial court erred as a matter of law when it dismissed the Hildreth parties' claim for abuse of process, set forth in Count Three of the Amended Counterclaim in Case No. 99–CV–0195, pursuant to Rules 12(B)(6) or 12(C) of the Ohio Rules of Civil Procedure."

{¶ 70} On May 4, 2001, Hildreth filed an amended counterclaim, which included a claim for abuse of process. On August 15, 2002, the Semco parties filed a motion to dismiss the abuse-of-process claim, which the trial court granted. The Ohio Supreme Court has held, "In order for a court to dismiss a complaint for failure to state a claim upon which relief can be granted (Civ. R. 12(B)(6)), it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery." *O'Brien v. Univ. Community Tenants Union, Inc.* (1975), 42 Ohio St.2d 242, 71 O.O.2d 223, 327 N.E.2d 753, syllabus. Further, in construing a complaint for purposes of a dismissal motion, a court

must, as a matter of law, accept all the factual allegations in the complaint as true, and in order to grant such a motion it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recover. Id. In addition, the court has determined that a court "must presume that all factual allegations of the complaint are true and make all reasonable inferences in favor of the non-moving party." *Mitchell v. Lawson Milk Co.* (1988), 40 Ohio St.3d 190, 192, 532 N.E.2d 753.

{¶ 71} More recently, the court has noted, "This standard for granting a motion to dismiss is in accord with the notice pleading regimen set up by the Federal Rules of Civil Procedure and incorporated into the Ohio Rules of Civil Procedure. Under these rules, a plaintiff is not required to prove his or her case at the pleading state. Very often, the evidence necessary for a plaintiff to prevail is not obtained until the plaintiff is able to discover materials in the defendant's possession. If the plaintiff were required to prove his or her case in the complaint, many valid claims would be dismissed because of the plaintiff's lack of access to relevant evidence. Consequently, as long as there is a set of facts, consistent with the plaintiff's complaint, which would allow the plaintiff to recover, the court may not grant a defendant's motion to dismiss." *York v. Ohio State Highway Patrol* (1991), 60 Ohio St.3d 143, 144–145, 573 N.E.2d 1063. Since all factual allegations in the complaint are presumed true, only legal issues are presented, and an entry of dismissal on the pleadings will be reviewed de novo. *Mitchell,* 40 Ohio St.3d at 192, 532 N.E.2d 753.

{¶ 72} The Ohio Supreme Court has determined, "The three elements of the tort of abuse of process are: (1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process." *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.* (1994), 68 Ohio St.3d 294, 626 N.E.2d 115, paragraph one of the syllabus. "Simply, abuse of process occurs where someone attempts to achieve through use of the court that which the court is itself powerless to order." *Robb v. Chagrin Lagoons Yacht Club, Inc.* (1996), 75 Ohio St.3d 264, 271, 662 N.E.2d 9.

{¶ 73} Hildreth's counterclaim for abuse of process alleges that the Semco parties set the instant proceeding in motion in proper form, that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed, i.e. interfering with the Hildreth parties' ability to lawfully conduct a competing business and to put it out of business, and that Hildreth was directly damaged from Semco's wrongful use of process. This counterclaim also recites many of the facts previously discussed in this opinion, as well as alleging that Semco threatened to sue various vendors, potential customers, and sales repre-

sentatives of Hildreth and contacted law enforcement with false information of theft by Hildreth's employees. Assuming these allegations to be true, as this court is required to do, the complaint contained sufficient information to withstand a motion to dismiss the abuse-of-process claim. Therefore, the trial court erred in dismissing this claim, and Hildreth's third assignment of error is sustained.

{¶ 74} For these reasons, each of Semco's six assignments of error is overruled. In addition, Hildreth's first and second assignments of error are overruled, and its third assignment of error is sustained. Thus, the judgment of the Court of Common Pleas of Marion County, Ohio, is affirmed in part and reversed in part, and the matter is remanded to that court for further proceedings in accordance with this opinion.

Judgment affirmed in part,
reversed in part
and cause remanded.

THOMAS F. BRYANT, P.J., and WALTERS, J., concur.