[Cite as *State v. Cooper*, 2014-Ohio-817.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99567**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# MICHAEL P. COOPER

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-558280

**BEFORE:** McCormack, J., Blackmon, P.J., and Stewart, J.

**RELEASED AND JOURNALIZED:** March 6, 2014

**ATTORNEYS FOR APPELLANT**

Patricia J. Smith
4403 St. Clair Avenue
The Brownhoist Building
Cleveland, OH   44103

Sylvia A. Rhodes
P.O. Box 514
Kent, OH 44240


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Daniel T. Van
Assistant County Prosecutor
8th Floor, Justice Center
1200 Ontario Street
Cleveland, OH   44113

TIM McCORMACK, J.:

{¶1} Defendant-appellant, Michael Cooper, appeals from a judgment of the Cuyahoga County Court of Common Pleas that convicted him of burglary, menacing by stalking, and telecommunications harassment, after a jury found him guilty of these offenses. He claims his convictions are against the manifest weight of the evidence and his trial counsel provided ineffective assistance. He also contends the trial court sentenced him to consecutive sentences without making the requisite statutory findings. After a careful review of the record, we affirm his convictions but remand the matter to the trial court for the limited purpose of making the proper findings for consecutive sentences as required by statute.

{¶2} Cooper and Audree Calhoun ("Calhoun"), the victim in this case, met in 2009 and dated off and on. The two had a volatile relationship, partly because Calhoun's adult sons did not approve of the relationship. On Thanksgiving Day in 2011, a scuffle occurred between Cooper and Calhoun's family. After Thanksgiving, while the two attempted reconciliation, Cooper became increasingly obsessed with Calhoun and began to leave harassing and threatening voicemails on Calhoun's and her family's phones.

{¶3} Their troubling relationship culminated in the shooting of Cooper by Calhoun in her home. In the early morning of January 4, 2012, the day Calhoun was to file a restraining order against Cooper, Calhoun found Cooper in her residence. She shot him after giving several warnings to leave. The bullet pierced Cooper's cheek.

**{¶4}** Cooper survived, and was subsequently indicted for burglary, two counts of menacing by stalking, and telecommunications harassment. The matter proceeded to a jury trial.

**{¶5}** The jury found Cooper guilty of all four counts. The trial court sentenced him to (1) two years on burglary, (2) one year (concurrent) on the two stalking counts, and (3) six months on telecommunications harassment. The three terms are to be served consecutively, adding to a total of three and one-half years.

**{¶6}** On appeal, Cooper raises three assignment of error. We first address the second assignment of error under which Cooper claims his convictions of burglary, menacing by stalking, and telecommunications harassment are against the manifest weight of the evidence.

## Manifest-Weight Claim

**{¶7}** Unlike sufficiency of the evidence, manifest weight of the evidence raises a factual issue.

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 511 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶8}** In evaluating a manifest weight claim, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. When examining witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 489 N.E.2d 277 (1986). A factfinder is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18. A review of a manifest-weight claim requires us to review the evidence abduced at trial.

## Background

**{¶9}** Calhoun testified at great length to the couple's tumultuous relationship and the events leading to the January 4, 2012 shooting. She began dating Cooper in 2009, and broke up with him in March 2010 because of his temperament. In November 2011, they reconciled. The day before Thanksgiving, he became angry because she did not show up to pick him up and take him to her house as they had planned. He called her repeatedly and eventually showed up at her house at 1:30 a.m., carrying a screwdriver. She was in bed asleep, and he told her to get dressed and to leave with him. She left with him in her daughter's vehicle. After spending a few hours at his house, around 5:00 a.m., they decided to return to her house so that he could talk to her children.

{¶10} When they arrived, Calhoun's sons were unhappy with Cooper so she tried to drive him back to his house. Her sons, 19, 20, and 21, and nephew blocked the vehicle, pulled Cooper out, and a scuffle occurred. Calhoun told her sons to let her handle the situation, and the two drove back to his house. When they arrived at Cooper's driveway, he demanded her phone. When she refused, he took a rock and smashed the vehicle's windows. She gave in and handed him her phone, which he threw into a field. When they went inside his house, he started throwing furniture around and used an air conditioner to block the door so she could not leave. She stayed there for seven hours before he finally let her go. He told her she belonged to him and he came first before her family. Before she left, he gave her a phone so that he could contact her. She filed a police report regarding the incident.

{¶11} After Thanksgiving, Cooper started to call Calhoun incessantly, leaving threatening messages. Five weeks later, she found him inside her home in an early morning hour and shot him.

### Evidence Regarding Menacing by Stalking and Telecommunications Harassment

{¶12} The jury found Cooper guilty of two counts of menacing by stalking as defined in R.C. 2903.211(A)(1), which states, "No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person."

{¶13} The jury also found Cooper guilty of telecommunications harassment as defined in R.C. 2917.21(A)(3), which states, "No person shall knowingly make or cause to be made a telecommunication, or knowingly permit a telecommunication to be made from

a telecommunications device under the person's control, to another, if the caller * * * [d]uring the telecommunication, violates section 2903.21[1] of the Revised Code[.]"[2]

{¶14} According to Calhoun's testimony, within an hour of her returning home on Thanksgiving, after being kept at his house for several hours, Cooper started calling incessantly on the phone he had given her. For the next several weeks, he continued to call her, leaving 50 to 60 voicemail messages on her phone. She reported to the police the harassing phone messages, which were played for the jury at trial.

{¶15} Calhoun testified further that, a week after Thanksgiving, she finally answered Cooper's phone call and told him the relationship was over. He started to call employees at her work, a school in Cleveland. The school's security notified the police.

{¶16} Calhoun testified that, on December 17, 2011, she was at her sister's house for a party when Cooper called her and threatened to "have a gang surrounding [her] house" and kill her. She left the party and went to the Bedford police department to file

---

[1] R.C. 2903.21 defines the offense of aggravated menacing and states, "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person * * *."

[2] The offense of telecommunications harassment is a misdemeanor of the first degree on a first offense, but a felony of the fifth degree on each subsequent offense. Cooper's offense is an F5 because he had a prior conviction. At trial, a deputy clerk for Cuyahoga County Common Pleas Court testified to the authenticity of a 2007 journal entry, which found Cooper guilty of menacing by stalking, telecommunications harassment, and the violation of a protection order. A deputy sheriff from Cuyahoga County sheriff's office also testified that the fingerprints collected from the defendant during the booking in the 2007 case were Cooper's fingerprints.

another police report. Calhoun estimated that between Thanksgiving and January 4, Cooper called her over 100 times.

{¶17} Calhoun's father, a police officer, was also receiving telephone calls from Cooper. Her father testified at trial that he received 50 or 60 voicemails, where Cooper threatened to harm Calhoun's children. Because of the threatening nature of these phone calls, Calhoun's father gave Calhoun a gun for protection. Calhoun's nephew who stayed at Calhoun's residence during the time, testified that he received 30 voicemails on his phone from Cooper, who demanded that the nephew pay for the medical bills for Cooper's injuries sustained in the Thanksgiving altercation.

{¶18} Throughout this time, Calhoun, unbeknown to Cooper, kept the Bedford police informed of all the phone calls and threats made by Cooper.

{¶19} In addition to the phone calls, Calhoun testified that between Thanksgiving and January 4, 2012, Cooper tried to break into her house numerous times. She testified that he would "[come] over early in the morning, banging on [her] door, trying to kick [her] door in, [and] trying to come into the house[.]" Calhoun's nephew testified that, before the shooting incident, Cooper showed up at least twice and tried to get inside the residence. Calhoun called the police on one of these two occasions.

{¶20} Cooper testified to a different account of the various events leading to the January 4 shooting. He testified he spent the day of Thanksgiving at his house with Calhoun until 6:00 p.m., when they went back to her house. Her sons demanded to know who he was. When she told them that she was in love with him and planned to marry

him and that he was probably going to live with them, "the hell broke loose." He and Calhoun tried to leave, but her sons blocked their vehicle with their own vehicle. One of the sons pointed a gun at the window and demanded they get out of the vehicle. Cooper sustained injuries during the scuffle and later received treatments for his injuries.

{¶21} Cooper admitted the voicemails heard by the jury were left by him, but claimed Calhoun's sons had also been calling him constantly. He stated that he left the voicemails because he was upset with the way they were laughing at him and disrespecting him.

### Evidence Regarding Burglary

{¶22} Regarding Cooper's burglary offense, that offense is defined by R.C. 2911.12(A)(1), which states: "No person, by force, stealth, or deception, shall do any of the following: Trespass in an occupied structure * * * when another person * * * is present, with purpose to commit in the structure * * * any criminal offense[.]" In the indictment, the state specified that the criminal offense was menacing by stalking prohibited by R.C. 2903.211.

{¶23} Calhoun testified that on January 4, 2012, she was planning to file a restraining order against Cooper with the help of Lisa Hogan, Cooper's cousin. Around 5:30 a.m. in the morning, Hogan called her to discuss the logistics. While they were on the phone, the doorbell rang. Calhoun immediately suspected it was Cooper and asked Hogan to call the police. Calhoun then received a phone call from her oldest son. While on the phone with him and standing in the hallway on the second floor, she heard

glass crashing. Cooper then appeared on the first floor. He had come in through the back door near the kitchen. Calhoun started "hollering and fussing," telling Cooper to leave her house. Saying "[b]aby we need to talk," Cooper, by then in the hallway near the staircase, moved toward the staircase. Standing on the top of the staircase, and armed with a .357-Magnum her father had given her for protection, Calhoun warned Cooper she would shoot him if he took another step toward her. Cooper continued to approach, and Calhoun gave him three more warnings. After the third warning, while he was at the bottom of the staircase, she shot him in the right jaw. He fell to the floor near the staircase. The state's exhibit shows blood on the floor of the hallway next to the staircase.

{¶24} Calhoun's nephew testified that he was sleeping in Calhoun's basement in the early morning of January 4. He testified that he was awakened by a gunshot. He came upstairs and saw Cooper lying on the floor. He noticed that the glass on the back door was "busted out." He recalled that when he returned home the night before, he came in through that door, which he locked after he went inside the house.

{¶25} Calhoun testified that after the shooting, she received help from the Domestic Center for Women and Children and underwent therapy for a diagnosis of "post-traumatic syndrome."

{¶26} Cooper claimed that the shooting was the result of a "set up" by Calhoun and her family. He claimed he did not break into Calhoun's house. Rather, Calhoun had invited him to move in with her, and had him given keys to the house. He used the keys

to unlock the door on January 4, 2012. Calhoun and Cooper thus offered drastically different accounts as to how Cooper entered the house.

{¶27} Calhoun testified that Cooper gained entry into the house by breaking the glass panel of the back door near the kitchen. Calhoun's testimony is supported by a photograph depicting a broken glass panel on the back door, and two photographs (exhibit Nos. 7 and 20) depicting the bottom part of the door and a rug on the floor — although exhibit No. 7 is too blurry to see the broken glass clearly, exhibit No. 20 shows visible broken glass on the floor.

{¶28} The state's exhibit No. 27 depicts a set of keys found on Cooper's person in the morning of the shooting. Calhoun testified that after the Thanksgiving incident, she changed the lock on the back door. She stated that Cooper broke into her daughter's Explorer and stole the keys to the new lock, as well as a bank card and driver's licence; a police report was made of the incident. She changed the lock again, after telling Cooper their relationship was over. She testified that the keys recovered from his person on January 4 would not have opened the kitchen door.

{¶29} Cooper claimed that he had the keys to Calhoun's house on January 4, 2012, but his testimony was disjointed and incoherent. When asked about Calhoun's testimony that she had changed the lock, he stated: "She changed the bottom lock. She told me about that. She brought me the new keys over. She said 'my sons didn't feel comfortable with you having keys, so I changed the bottom locks so they will be

comfortable. [Here's] the other key.' She was really playing both ends against the middle."

{¶30} At another point, he testified that Calhoun had given him the keys when they stayed at Hogan's house in December 2011, where they attempted reconciliation. His recounting of it, however, was difficult to understand: "She gave me the keys again and said 'these are to the other door.' I said, 'What door?' She said, 'Well, I changed them again.' She said, 'Get your stuff, I want you there, you're going to live with me and my dad. * * *'"

{¶31} The transcript in addition reflects the following testimony by Cooper, which, again, we find difficult to decipher:

Q.    If you had the keys, why were you breaking windows to get in?

A.    Sir, I did not break her window to get into her house at all, okay?

Q.    You heard her testimony that she heard a loud noise that was the broken window to her rear door. Did you hear that testimony?

A.    Well, you know, Audree —

Q.    Did you hear that testimony?

A.    Absolutely, I heard it.

Q.    What is your response to that?

A.    This is her front door. If the jury would like to pass it around, this is the top lock, which is the bolt lock. This is the bottom lock where she claimed she changed it. That bolt lock was locked. When I broke the window or these windows, you can't open that door unless you got a key from both sides of that lock. I turned the key. The window was cracked. The screen was really blocking it. I walked in the house.

**{¶32}** The transcript reflects further disjointed testimony from Cooper when he explained how he ended up inside Calhoun's house:

Q.      * * *   If you had a set of keys, why didn't you use the keys?

A.      I did use the keys.

Q.      Well, did you ring the doorbell at any times?

A.      Yes. I did.   Something wasn't right.   Her nephew who just testified, he called me telling me to come over.

Q.      He called you to come to the house?

A.      He told me that he was willing to work this out, that Audree was upstairs waiting on you, he said come to the back door, that the front door was cracked, and * * * did not open correctly.   When I got there, I told him I would be there.   I didn't show up until like 2 days later.   When I got there, there was no car in the driveway.   In the 3 years I have been dating her, if her car is not there, she's not there.

At the time of the shooting, I rang the doorbell for 5 minutes.

**{¶33}** Asked why Calhoun shot him on January 4, Cooper did not answer directly, but claimed that Hogan had a romantic interest in Calhoun, which was her motivation for helping Calhoun obtain a restraining order against him.

**{¶34}** When asked by his counsel why he went to Calhoun's house in the early morning of January 4, Cooper gave a baffling account:   he had a key of a hotel room off Euclid Avenue, which he had rented for him and Calhoun for 6:00 a.m. that morning, and he wanted to surprise her with the hotel room.

**{¶35}** Cooper testified he was "set up" on January 4 by Calhoun and her nephew with "coaching" from her father.   He testified that after he was shot and lying on the

floor, Calhoun and her nephew discussed the "story" they were going to tell the police, and then her nephew "pushed [the glass panel] out with the gun."

## Convictions Are Not Against the Manifest Weight of the Evidence

**{¶36}** Cooper argues that his convictions are against the manifest weight of the evidence because he claims the evidence shows that Calhoun and her family had "set him up" for the burglary and the other two offenses, the motivation being to either to (1) stop him from going to the police about the Thanksgiving incident, (2) stop him from retaliating against the four Calhoun men, or to (3) stop him from trying to enforce a "contract" under which Calhoun had agreed to compensate him for injuries he sustained from the incident. He claims his account of how he got inside Calhoun's house is more credible than Calhoun's account and the jury lost its way in believing the state's witnesses. He makes a rather convoluted argument in his brief:

> The jury convicted [Cooper], so they must have concluded that he stole the keys and that one or more of his keys did not unlock the door. He must have broken the glass door panel and unlocked the door from inside. If the top deadbolt required a key from both sides, he would have been able to open it from the inside with the stolen keys, because she had changed only the bottom lock. The stolen keys unlocked the top deadbolt, and he broke the glass to open the bottom lock from the inside. This conclusion is illogical because it is premised on Ms. Calhoun's incredible testimony that the stolen keys were for the new locks, but also were not for the new locks because the locks were changed again after the keys were stolen.

**{¶37}** Our review of the trial testimony shows Cooper's testimony was diametrically opposed to Calhoun's testimony regarding whether he had permission to enter Calhoun's house in the early morning of January 4, 2012, and he appeared to have innocent explanations for all his conduct. We note that if an accused offers an innocent

explanation for his conduct, "a jury is not required to accept a competing inference of innocence if [the jury] may infer guilt, beyond a reasonable doubt, from the same circumstances." *State v. Levingston*, 106 Ohio App.3d 433, 437, 666 N.E.2d 312 (2d Dist.1995).

{¶38} In essence, the conflict in the testimony raises issues of credibility, which was exclusively within the purview of the jury, who observed the witnesses' "demeanor, gestures and voice inflections, and use[d] these observations in weighing the credibility of the proffered testimony." *Giurbino v. Giurbino*, 89 Ohio App.3d 646, 659, 626 N.E.2d 1017 (8th Dist.1993). The state produced evidence to show Cooper committed menacing by stalking, telecommunications harassment, and burglary as defined in R.C. 2911.12(A)(1); the criminal offense he intended to commit inside the victim's residence was a continuation of a pattern of conduct constituting the offense of menacing by stalking prohibited by R.C. 2903.211(A)(1). The jury resolved the conflict in favor of the prosecution, finding Calhoun's testimony to be more credible and concluding Cooper entered Calhoun's house without permission on that day. We will not second guess the jury's credibility determinations. The jury did not lose its way in resolving the conflict in the evidence. Cooper's manifest-weight claim is without merit. The second assignment of error is overruled.

## Claim of Ineffective Assistance of Counsel

{¶39} Cooper had a rocky relationship with his counsel. He fired his first counsel and later sought to replace his second counsel. The matter eventually proceeded to a jury

trial with Cooper represented by the second counsel. Under the first assignment of error, Cooper complains his counsel provided constitutionally ineffective assistance at trial. He claims counsel failed to prepare and present a defense, failed to object to the trial going forward with him appearing in prison garb, and failed to object to admission of certain police photographs and other prejudicial evidence. He also argues his counsel should have obtained his medical bills to bolster his credibility. Finally, he claims his counsel was asleep during the trial.

{¶40} In order to prevail on the ineffective assistance of counsel claim, a defendant must demonstrate (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A defendant, therefore, must show that counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.

{¶41} In Ohio, every properly licensed attorney is presumed to be competent and, therefore, a defendant bears the burden of proof. *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Counsel's performance will not be deemed ineffective unless and until the performance is proven to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. *State v. Iacona*, 93 Ohio St.3d 83, 105, 752 N.E.2d 937 (2001). Furthermore, decisions on strategy and trial tactics are generally granted wide latitude of professional judgment,

and it is not the duty of a reviewing court to analyze the trial counsel's legal tactics and maneuvers. *State v. Gau*, 11th Dist. Ashtabula No. 2005-A-0082, 2006-Ohio-6531, ¶ 35, citing *Strickland* at 689. Debatable trial tactics and strategies generally do not constitute ineffective assistance of counsel. *State v. Phillips*, 74 Ohio St.3d 72, 656 N.E.2d 643 (1995).

### Counsel's Alleged Failure to Prepare and Present a Defense

{¶42} First, Cooper complains his counsel failed to investigate his version of the events and made statements at the opening argument that were at odds with his own testimony. Our review of the opening argument reflects that the gist of the defense's theory was that Cooper had keys to Calhoun's house. This is also what Cooper claimed on the witness stand. We do not perceive the inconsistency claimed by Cooper.

{¶43} Second, Cooper complains counsel failed to demonstrate to the jury that Cooper's keys could unlock the door, which he claims could have rebutted Calhoun's testimony that the lock had been changed. This claim is purely speculative, as it is equally likely that counsel had investigated the matter and determined the keys could not unlock the door. Furthermore, even if the keys *could* unlock the door, Calhoun testified that Cooper had stolen the keys from her daughter's vehicle. More importantly, *even if* the victim had given the defendant keys to her house at some point, given the parties' volatile relationship, the jury could still reasonably conclude that the defendant did not have *permission* to use those keys to enter the victim's house on January 4, 2012. In other words, whether the defendant trespassed in the victim's house does not turn

exclusively on whether the keys possessed by the defendant *could* unlock the door. Therefore, his counsel could not be faulted for not making the demonstration.

{¶44} Third, Cooper complains counsel failed to object to the state's decision not to offer the audio recording with the voicemails (which were played for the jury at trial) into evidence. The state decided not to offer the audio recording into evidence because it contains other phone calls unrelated to this case. During the deliberation, the jury requested to hear again a particular voicemail referencing a certain incident. Pointing to the jury's request, Cooper claims there is a reasonable probability that the outcome would have been different if the jury could rehear the requested voicemail, which he claims would have shown that Cooper was not harassing Calhoun but was simply asking Calhoun to honor her agreement to pay for the medical bills he incurred from the Thanksgiving scuffle. This claim is without merit. Even if the jury could rehear the particular voicemail, the audio recording contains many other voicemails in which Cooper threatened and harassed Calhoun. The admission of the audio recording would not have benefitted the defense.

{¶45} Fourth, Cooper claims counsel failed to thoroughly cross-examine the state's witnesses. Specifically, he argues counsel could have more effectively cross-examined Calhoun and exposed inconsistencies in her testimony. The transcript reflects almost 60 pages of cross-examination of Calhoun by the defense counsel, which can hardly be described as inadequate. The jury is charged with the assessment of a witness's credibility and the resolution of any inconsistencies in the testimony. Its finding that the

victim was more credible than the defendant does not render counsel's performance constitutionally ineffective.

**{¶46}** Fifth, Cooper complains that his trial counsel failed to identify and interview potential witnesses. On appeal, he names four witnesses whom should have been interviewed by his counsel: (1) a man who witnessed the Thanksgiving altercation between Cooper and Calhoun's sons, (2) a man who overheard Calhoun threaten Cooper, (3) Detective Shawn Klubnik, who was on the scene the night Cooper was shot and who Cooper claims would have been able to confirm details about the keys and the police photographs that the detective had taken, (4) a doctor who treated Cooper's injuries after the Thanksgiving scuffle, and (5) "someone [who] could verify that he had a motel key on the date of the alleged burglary." Other than alluding to these potential witnesses, Cooper does not articulate how these witnesses' testimony would have made the outcome of this case different.

**{¶47}** Finally, Cooper claims counsel failed to rebut the claim that Calhoun shot him in self-defense. We fail to see how whether Calhoun acted in self-defense when she shot Cooper has any bearing on whether Cooper had permission to enter her house, which occurred prior to the shooting.

## Counsel's Alleged Failure to Object to Cooper's Appearance in Prison Garb During Trial

**{¶48}** Cooper wore prison garb throughout the jury trial. He refused to wear the street clothes available to him, unhappy with the fit of the clothes. On appeal, he claims his counsel rendered ineffective assistance in failing to object to his appearance in prison clothing and, as a result, he was prevented from having a fair trial. Cooper's claim is belied by the record.

**{¶49}** Our review of the trial transcript reflects that Cooper's counsel made efforts to obtain Cooper's own clothes but they had not arrived by the time the trial was to begin. Cooper was then offered two shirts, but rejected them. Before the jury was called, his counsel reported to the trial court that Cooper did not have street clothes but had indicated he was willing to go forward in his prison garb. The court cautioned Cooper that his appearance in prison garb might prejudice the jury against him. After a discussion at length regarding the efforts that had been made to obtain his clothes, the court recessed the case so that the clothing issue could be resolved.

**{¶50}** The transcript then reflects that, after the recess, the trial court stated on the record that "* * * I want the record to show that Mr. Cooper has delayed this trial because he was not properly attired initially. He was properly attired for trial so the jury will not be prejudiced by his dress. So if the attorneys are ready to go, we'll bring in the jury."

**{¶51}** The transcript reflects that, the next day, Cooper again appeared in court in prison garb. Another lengthy discussion took place regarding his clothing. Cooper complained the clothes brought by his cousin were "too tight" and he was "out of his

element" in it. The trial court then decided to go forward with the proceedings. After the morning session of the first day of trial, Cooper's counsel reported to the court that Cooper's first counsel had brought Cooper's own clothes. Counsel requested that the court order Cooper to change into these clothes. The trial court issued the order and recessed the case. Cooper, however, refused to wear them, insisting they had to be altered first. As a result, Cooper wore his prison garb throughout the jury trial.

{¶52} We recognize that a defendant's right to a fair trial may be infringed by appearing before a jury in jail clothing. *Estelle v. Williams*, 425 U.S. 501, 504, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). The United States Supreme Court, however, declined to create a strict rule requiring the reversal of all convictions in which the defendant appeared before the jury in prison clothing, because the court recognized that a defendant may purposely elect to stand trial in jail clothing as a trial strategy. *Id.* at 507-508.

{¶53} Here, our review of the record reflects both the trial court and Cooper's counsel made extensive efforts to have him appear in street clothes so that he would not be prejudiced by appearing in prison clothes. Cooper, however, rejected the available civilian clothes repeatedly. He cannot now be heard to complain about any prejudice that may have resulted.

### Other Alleged Failures by Counsel

{¶54} Cooper also claims his counsel's assistance was ineffective because he failed to object to the admission of certain evidence. First, he argues counsel should have objected to the admission of several photographs. The first photograph, state's exhibit

No. 10, depicts the staircase, captioned "View From Approximate Area on Stairs When Cooper Was Shot. Third Stair from the Bottom." Cooper claims the caption is unclear as to whether "third stair from the bottom" refers to where he was shot or where the police photographer stood when taking the picture. Regarding this claim, we note that Calhoun testified consistently she shot Cooper when he was at the bottom of the staircase. Cooper does not explain, and we fail to understand, why the potentially ambiguous caption renders its admission so prejudicial that his counsel's failure to object to it affects his constitutional right to effective counsel.

{¶55} Second, Cooper also complains that the state's exhibit No. 27, which depicts the keys found on his person, is improperly captioned "Keys from Cooper's Property. Belongs to Calhoun. Stolen from Vehicle." He argues the caption is improper because it was based only on Calhoun's testimony that the keys were stolen, and therefore his counsel should have objected to the exhibit's admission. We fail to see the impropriety of the caption, because it *was* the state's contention that the keys were stolen — which Cooper rebutted with his own testimony — and the jury could choose to believe or disbelieve the evidence.

{¶56} Third, Cooper complains the state's exhibit Nos. 6, 7, 19, and 20 depicting the rug area under the broken glass panel and captioned as "back door with glass on the floor" and "glass from back door on floor," should have been objected to by his counsel. Although some of the photographs are not clear, we note that the jurors could see for themselves whether the photographs clearly show broken glass. These photographs

would not have been inadmissible; therefore, counsel could not be faulted for a failure to object.

{¶57} In addition, Cooper complains his counsel should have obtained his medical bills for the injuries he sustained in the Thanksgiving incident to bolster his credibility, and should have presented "blood splatter evidence" to show the exact location of where he was shot. We fail to see how the evidence would have changed the outcome of the trial.

{¶58} Finally, Cooper alleges his counsel was sleeping during trial. The transcript shows that before the closing argument, Cooper reported to the trial court that his counsel "was asleep through trial, let the record reflect. I woke him up 4 times." The court responded, "Mr. Cooper  * * *  At no time did I note your attorney being asleep or I would have said something." Cooper's allegation is not supported by the record.

{¶59} Having reviewed the multitude of allegations Cooper makes against his counsel, we conclude his ineffective assistance of counsel claim lacks merit and overrule the first assignment of error.

### Consecutive Sentences

{¶60} Under the third assignment of error, Cooper contends the trial court failed to make the requisite statutory findings prior to imposing consecutive sentences on his offenses of burglary, menacing by stalking, and telecommunications harassment. This court has required the trial court to make distinct findings pursuant to R.C. 2929.14(C)(4) before imposing consecutive sentences. *See State v. Venes*, 8th Dist. Cuyahoga No. 98682, 2013-Ohio-1891. The trial court in this case failed to make these required

findings, and the state concedes the error.  We therefore reverse the consecutive sentences and remand the case for the limited purpose of determining whether consecutive sentences are proper, and if so, to make the required findings.   The third assignment of error is sustained.

**{¶61}** Cooper's convictions are affirmed, but his consecutive sentences are reversed.   The matter is remanded to the trial court for further proceedings consistent with this opinion.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

PATRICIA ANN BLACKMON, P.J., and
MELODY J. STEWART, J., CONCUR